# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

333 Constitution Ave. NW, Washington, DC 20001

Isaac Mulamba

*Plaintiff.*

**AMENDED COMPLAINT**

*v.*

**COMPLAINT FOR DAMAGES DECLARATORY RELIEF, AND INJUNCTIVE RELIEF**

**JURY TRIAL DEMANDED**
**Case No: 25-cv-3446 (JMC)**

Ho-Chunk, Inc;

Flatwater Group, Inc;

Ho-Chunk Shared Services, Inc;

Lance Morgan;
In his individual capacity

Rocky Mireles;
In his individual capacity

Jay Ludwig.
In his individual capacity

*Defendants.*

RECEIVED
JUL 30 2026
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## CLAIMS FOR RELIEF

**Federal Law Claims**........................................35

I. Violation of the Equal Protection Clause in the Enforcement of Contracts—42 U.S.C. § 1981

II. Violation of the Civil Conspiracy Statute—Civil Conspiracy to Deprive of Equal Protection & Equal Contractual Rights—42 U.S.C. § 1985(3)

III. Violation of the Fair Credit Reporting Act (FCRA)—15 U.S.C. §§ 1681 et seq.

IV. Violation of The Trafficking Victims Protection Act (TVPA)—18 U.S.C. § 1589-90

**District of Columbia Law Claims**........................................46

V. Unjust Enrichment

VI. Fraudulent Concealment

VII. Fraud in Contract (or Fraudulent Misrepresentation)

VIII. Promissory Fraud

IX. Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing

**Virginia State Law Claims**........................................60

X. Intrusion Upon Seclusion

XI. Tortious Interference With Business Expectancy

XII. Tortious Interference With Contract

XIII. Statutory Business Conspiracy (or in the alternative, Common-Law Civil Conspiracy)

XIV. Violation of the Virginia Consumer Protection Act (VCPA)—Va § 59.1-196 et seq.

## 1. Complaint

Plaintiff Isaac Mulamba ("Plaintiff"), proceeding pro se, originally filed this action under seal and in camera pursuant to 31 U.S.C. § 3730(b)(2) on September 29, 2025. Following the Government's decision not to intervene, Plaintiff now files this Amended Complaint. Plaintiff brings this action against Ho-Chunk, Inc. ("HCI"), Flatwater Group, Inc. ("FGI"), Ho-Chunk Shared Services, Inc. ("HSSI"), Lance Morgan, Rocky Mireles, and Jay Ludwig, (collectively, "Defendants"), and alleges as follows:

## 2. Background

1. Prior to Executive Order 14151[1], the Federal Government required agencies and contractors to comply with Executive Order 11246 on Equal Employment Opportunity. One recognized method of compliance was the implementation of Diversity, Equity, and Inclusion ("DEI") initiatives. In practice, however, numerous corporate entities fraudulently misrepresented their compliance. While some engaged in token hiring—bringing on a small number of underpaid minorities to create the appearance of compliance, others pursued pretextual hiring, recruiting minority employees only to terminate them shortly thereafter.

2. Defendants herein subjected Plaintiff, a Black African immigrant, to a highly intrusive and dehumanizing process, demanding biological specimens including urine and hair samples testing. This was not done out of legal necessity or legitimate business purpose, but for commercial exploitation. Defendants did not merely test the boundaries of human decency; they defied the moral and legal standards of a civilized society, reducing a human being to a disposable commodity. Defendant's conduct was deliberate, calculated, and central to their scheme to defraud both Plaintiff and the Federal Government.

---

1. President Trump signed EO 14151 (ending DEI and DEIA mandates…) (01/2025) and EO 14173 (Ending Illegal Discrimination and Restoring Merit-based Opportunity).

### 3. Nature of the Claims

3. This civil action alleges highly sophisticated labor-related fraud perpetrated by Federal Government contractors—a case of minorities exploiting other minorities.

4. The case concerns tribally-owned entities, their employees, off-reservation interstate commerce, intentional torts involving non-Indians and Federal Government contracts.

### 4. Factual Summary

5. The circumstances of this suit arise from Defendants' Government contracting practices and their wrongful rescission of an employment offer.

6. Plaintiff applied for the Data Analyst II position as advertised by HCI.

7. Agents of HCI and FGI found Plaintiff qualified; they proposed a salary and extended a job offer contingent upon a government contract award. Plaintiff signed the offer letter.

8. Plaintiff informed Defendants that he already possessed a valid security clearance, initially issued by DHS. Defendants nevertheless required a drug test, credit, and criminal background checks. Plaintiff complied, passed the tests and checks, and was cleared, as expected.

9. Once Defendants received the results, they behaved as if they owned Plaintiff's data; they kept quiet and didn't say a word, there was no follow-up.

10. And then, suddenly, HCI rescinded the job offer, purportedly because they did not secure the Government contract.

11. Plaintiff discovered months later that Defendants had actually secured the DHS Data Analytics Contract more than one month before they made the contingent job offer.

12. HCI and FGI are tribally-owned entities, essentially minorities. They advertise employment opportunities, online and all over the United States, to attract a wide range of applicants, not just Indian Americans, and the tribal corporate entities have employees from diverse

backgrounds. In fact, the two employees of HCI and FGI who implicated the tribal corporate entities were non-Indian themselves.

13. Defendants have this disclaimer: "Ho-Chunk, Inc. is an EEO employer. All qualified applicants will receive consideration for employment without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, disability, or status as a protected veteran. However, preference may be extended to persons of Indian descent in accordance with applicable laws." This is the very subterfuge Title VII was enacted to thwart but that's not the issue.

14. Defendants' conduct primarily amounted to fraud in the inducement as the original job advert omitted a "contract award" contingency; the interviewers withheld contract-specific information, and further, they included misleading information in the job offer.

15. Plaintiff alleges that Defendants' rescission defrauded the United States in violation of the False Claims Act, 31 U.S.C. §§ 3729–3733; constituted human trafficking-related practices prohibited under 18 U.S.C. §§ 1589–1590; and infringed upon his contractual rights under 42 U.S.C. § 1981. Plaintiff asserts that Defendants also violated his state rights.

16. Plaintiff resigned from his former employer in reliance on Defendants' representations, endured difficulties including financial hardship that nearly resulted in divorce.

17. Plaintiff seeks recovery of treble damages under the False Claims Act, compensatory and punitive damages as well as prospective injunctive and equitable relief as authorized by law.

**5. Parties**

18. Plaintiff is a Black male and a U.S. citizen of African descent in his mid-40s.

19. The federally recognized Winnebago Tribe of Nebraska (the "Nation") wholly owns Ho-Chunk, Inc. (HCI). HCI wholly owns all of its subsidiaries including FGI and HSSI; and Lance Morgan is the CEO of HCI and all its subsidiaries.

20. In this Complaint, Ho-Chunk, Inc., though legally a separate entity, may be used interchangeably with Ho-Chunk Shared Services, Inc. This is perhaps confusing at first glance, but the corporate name-shuffling is itself part of the deceptive conduct at issue.

21. Lance Morgan is the President/CEO of HCI since its creation and of all of its subsidiaries. He's a member of the Winnebago Tribe of Nebraska.

22. Rocky Mireles is the Hiring (Program) Manager at FGI. He confirmed during the interviews that he was not a member of the Winnebago Tribe.

23. Jay Ludwig is the Senior HR Recruiter at HCI. He's Caucasian. He did not state anything in regard to being a member of the Winnebago Tribe.

**6. Jurisdiction and Venue**

24. At all times of the factual allegations, Plaintiff was a resident of Fairfax County, Virginia, and remains a Citizen of Pennsylvania.

25. Defendants HCI and FGI maintain principal physical offices in Winnebago and Bellevue, Nebraska, as well as in Fairfax and Alexandria, Virginia, as they engage in interstate commerce off-reservation with fulfillment operations throughout the United States. See Exhibit 1.

26. The amount in controversy exceeds the jurisdictional minimum of $75,000.

27. Plaintiff reiterates that the claims in this suit target the legally separate tribally-owned entities as well as the employees in their individual capacities.

28. This Complaint specifically targets the tribal entities involved with the concealed DHS contract at issue, not the tribe itself. The claims challenge the validity, performance, and representations made by Defendants with respect to Solicitation 75ACF124Q00053.

29. HCI is a federally chartered corporation under (IRA) 25 U.S.C. § 5124 (old § 477), of which 25 U.S.C. § 5124 confers corporate status distinct from the tribe itself.

30. Moreover, HCI is a section 17 tribally-chartered corporation.

31. Under 31 U.S.C. §§ 3729–3733, this Court has original subject-matter jurisdiction to enforce the civil provisions of the False Claims Act against any Federal Government contractor, grantee, or recipient of federal funds who knowingly submits false or fraudulent claims to the United States Government, as expressly authorized under § 3730(a) and (b).

32. The Winnebago Tribal Code states, e.g., that full faith and credit must be given to protection orders issued by state or other tribal courts in accordance with the federal Violence Against Women Act, including human trafficking and related violations. The Winnebago tribal courts enforce a code based on specific federal law; hence, this federal court can assert jurisdiction and adjudicate the claims based on specific federal law.

33. Under 18 U.S.C. § 1595, this Court has original subject-matter jurisdiction to impose civil remedies against whoever for violations of the Trafficking Victims Protection Act (TVPA), including against foreign and domestic actors, where the offense either: 1) occurs in whole or in part within U.S. territory, or 2) involves a perpetrator or victim with a U.S. nexus, consistent with Congress's intent under § 1596.

34. This Court has jurisdiction over the claims per 28 U.S.C. §§ 1331 (federal question).

35. Defendants have mandatory contact with D.C. on a daily basis thanks to the awarded DHS contract and prior Government Contracts awarded in D.C by other agencies (e.g., DOI, DoD,…etc.).

36. Defendants maintain offices in Fairfax and Alexandria, VA and "continuous and systematic general business contacts" with D.C to deal with the Government Contracts.

37. The alleged facts concern Federal Government contracts awarded to Defendants by agencies, including DHS, headquartered in D.C.

38. This lawsuit includes a claim of fraud against the United States under 31 U.S.C. §§ 3729–3733. The Federal Government exercises its authority from Washington, D.C., and the Federal Government contract at issue was issued in D.C.

39. Venue is proper in this District Court pursuant to 28 U.S.C. §§ 1391(b)(1), (2) and (e)(1) because the substance of this lawsuit arose from events in the District of Columbia.

40. This Court has supplemental jurisdiction over the state law claims per 28 U.S.C. § 1367, as they form part of the same case as the federal claims.

41. Generally, tribal courts have jurisdiction over a civil suit by any party, member, or non-member against a tribal member defendant for a claim arising on the reservation. *See Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802 (9th Cir. 2011); and *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 14 (1987) ("recognizing the Federal Government's long-standing policy of encouraging tribal self-Government over both their members and their territory") (quoting *United States v. Mazurie*, 419 U.S. 544, 557 (1975)).

42. "Non-Indians are not subject to tribal jurisdiction." *Menominee Tribal Enters. v. Solis*, 601 F.3d 669 (7th Cir. 2010) accord *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982).

43. "Indians going 'beyond reservation boundaries' are generally subject to state law." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148-49 (1973). The reach of a state's regulatory power turns on the location of ("where") and participants in ("who") the targeted conduct. *See Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 113 (2d Cir. 2014). The State's power increases, though, when its law targets the conduct of nonmembers. *See White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 144-45 (1980), or members' "dealings" with nonmembers. *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216 (1987).

44. This Court may grant declaratory or injunctive relief, and other appropriate relief under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 704-706. Specifically, this Court can grant prospective injunctive relief under *Ex parte Young*, 209 U.S. 123, 159–60 (1908).

45. In accordance with 31 U.S.C. § 3730(e)(4)(A), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. None of the allegations set forth in this Complaint are based on a public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative or General Accounting Office report, hearing, audit or investigation, or from the news media.

46. Relator Isaac Mulamba has direct and independent knowledge of the information on which the allegations set forth are based. In accordance with 31 U.S.C. § 3730(e)(4)(B), Relator is an original source with direct and independent knowledge of the allegations.

47. Accordingly, Defendants could have—and indeed should have—foreseen being sued in a District Court in Washington, D.C.

**7. Exhaustion of Federal Administrative or Tribal Remedies**

48. The claims presented herein are not subject to the administrative exhaustion requirements of the Equal Employment Opportunity Commission (EEOC).

49. Federal courts are not required to defer to tribal courts when an assertion of tribal jurisdiction would be "motivated by a desire to harass or is conducted in bad faith…or where the action is patently violative of express jurisdictional prohibitions, or where exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction." *Nat'l Farmers Union*, 471 U.S. at 857 n. 21. Further, when "it is plain that no federal grant provides for tribal governance of non-members' conduct on land covered by *Montana*'s rule[2]," exhaustion "would serve no purpose other than delay." *Nevada v. Hicks*, 533 U.S. 353, 369 (2001). Lastly,

where the primary issue involves an exclusively federal question, exhaustion of tribal remedies may not be mandated. *See El Paso Natural Gas v. Neztsosie*, 526 U.S. 473 (1999).

50. Tribal court jurisdiction depends largely on: (1) whether the defendant is a tribal member; and (2) whether the dispute occurred in Indian Country,[3] particularly lands held in trust by the United States for the use and benefit of a tribe or tribal member or fee lands within the boundaries of an Indian reservation.[4]

**8. Factual Allegations**

51. The Winnebago Tribe of Nebraska created HCI in 1994, to help its people by creating jobs and diversifying the Tribe's revenue.

52. HCI is legally distinct from the Tribe; and operates through subsidiaries including FGI, HSSI, All Native Group, Ho-Chunk Technical Solutions, Inc, Ho-Chunk Farms Inc, Ho-Chunk Construction Management Services Company…etc. Ludwig and Mireles acted within the scope of employment on behalf of HCI and FGI respectively, at all times in this complaint.

53. HCI is governed by a tribal corporate charter that clearly states that "it can sue or be sued…" in its own capacity, separately from the Winnebago Tribe of Nebraska (upon discovery).

54. Defendants clearly publish on their website and in corporate materials that they exist to create jobs for members of the Winnebago Tribe of Nebraska. *See* Exhibit 2.

---

2. *Montana v. United States*, 450 U.S. 544, 566 (1981) ("Indian tribes retain inherent power to exercise *some* forms of civil jurisdiction over non-Indians *on their reservations*…").

3. Indian Country includes: (1) all land within the limits of any Indian reservation; (2) "dependent Indian communities" within the borders of the United States; and (3) all Indian allotments, including rights-of-way. 28 U.S.C. § 1151 (2000). "Although [that] definition by its terms relates only to . . . criminal jurisdiction . . . it also generally applies to questions of civil jurisdiction. . . ." *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 527 (1998).

4. "The ownership status of land…is only one factor to consider in determining whether [tribal courts have jurisdiction over non-members]. It may *sometimes* be a dispositive factor." *Nevada v. Hicks*, 533 U.S. 353, 360 (2001).

*HCI advertised the job position online, in Virginia*

55. HSSI was awarded a Government Contract. Consequently, HCI advertised the Data Analyst II position on Indeed.com. See Exhibit 3.

56. On September 5, 2024, Plaintiff received his daily job alert email from Indeed.com for Fairfax, VA which listed Data Analytics positions, including HCI's Data Analyst II role.

57. Plaintiff promptly applied to the Data Analyst II posting through HCI's website, and received a confirmation, stating that his application had been received and would be given consideration. See Exhibit 4.

58. On September 6, 2024, one day after submitting his application, Plaintiff checked again and found that HCI had delisted the Data Analyst II position from Indeed.com.

*Ludwig reviewed Plaintiff's application material and found Plaintiff qualified*

59. On September 27, 2024, Ludwig, Senior HCI recruiter contacted Plaintiff via email and expressed interest in scheduling a preliminary phone screening. See Exhibit 5.

60. During the October 1, 2024 phone call, Ludwig expressed positive feedback regarding Plaintiff's qualifications and sought to schedule a next-round interview with Mireles, FGI Hiring Manager. Ludwig clarified that any potential employment offer would be contingent upon HCI securing a pending Government contract. The contract specifics were not discussed.

61. During the October 1, 2024 call, Ludwig inquired about Plaintiff's willingness to work for a tribally-owned enterprise, noting that other candidates withdrew from consideration upon learning the position was contingent upon contract award and with a tribally-owned entity.

62. Plaintiff responded that he understood that they were in a bidding process and every organization served specific constituencies. Plaintiff further explained that he had no reservations about a contingency or working for a tribally-owned enterprise on a Government Contract.

63. Ludwig seemed impressed with Plaintiff's response, and stated that he appreciated Plaintiff's attitude, and proceeded to schedule the interview with Mireles.

*Mireles performs the job interview and finds Plaintiff qualified*

64. On October 8, 2024, the second interview happened via online video:

a. Mireles shared his military experience, and said that on the day he retired, he simply walked across the road and started working for his new employer, HCI.

b. He discussed the company and how he had enjoyed working there for 11 years.

c. The conversation was cordial…he laughed and said he wasn't a tribal member.

d. He asserted that they were imminently awaiting a contract award, at any time, or before the end of 2024, they will receive feedback.

e. He said they were confident of being awarded and that Plaintiff was a good fit.

f. He confirmed that the contract would initially be for 5 years and renewable.

g. He also confirmed that the opportunity would be full-time, remote and the employer offered benefits and retirement contribution plans.

h. He thanked Plaintiff for his attitude and taking part in the interview.

i. Like Ludwig, he reiterated that any job offer would be contingent upon contract award but offered no specifics about the contract, name, or description.

j. But Mireles encouraged Plaintiff to keep applying for other opportunities, and said if Plaintiff "found something, he should promptly let him know" and he, Mireles, would do the same with any contract updates (but he never did).

k. He went further and added that even after the contract was awarded, Plaintiff was still free to leave at any time…in his own words: "We don't hold onto people here, we understand there are plenty of great opportunities out there."

65. During the interview, Mireles asked Plaintiff about his methods for staying current with developments…a variation of: "How do you stay up to date with industry developments?" Plaintiff responded that he maintained subscriptions that delivered relevant updates daily…in the same manner that he found the job…from the Indeed.com job alert.

66. Neither Mireles nor Ludwig asked any technical questions, despite the highly technical nature of the position. They were unable to answer Plaintiff's technical questions about the software to be used and such. They responded vaguely when Plaintiff asked about future internal team members and daily meeting schedules. Plaintiff asked questions about workplace conflicts and resolution, and Mireles affirmed that he would be the point of reference to resolve such issues.

67. Mireles continued with other interview questions and Plaintiff provided the answers. Finally, Mireles promised that Ludwig would reach out regarding the interview outcome.

68. Mireles concluded by stating that he wanted to expedite Plaintiff's onboarding process so that, upon contract award, the company could immediately welcome Plaintiff to the project…in his own words: "so we can hit the ground running."

*HCI selects Plaintiff for the job, but FGI extends the job offer*

69. On October 15, 2024, Ludwig called Plaintiff and informed him that he had been selected for the position, and reiterated that the job offer remained contingent upon contract award.

70. During the October 15, 2024 call, Ludwig proposed an annual base salary of US$115,000.00 excluding benefits. Plaintiff agreed. The salary was in line with the responsibilities in the job description. Thus, a mutual agreement regarding compensation was reached.

71. Ludwig followed up in email about the selection. *See* Exhibit 6.

72. The contingent job offer was extended. Plaintiff logged into HCI's website, accepted, signed, and downloaded the contingent job offer letter. *See* Exhibit 7.

73. The job offer was not issued to work for HCI—the company to which Plaintiff had originally applied—instead, the offer came from Ludwig, at HCI, to work for FGI.

74. The offer letter referenced a solicitation 75ACF124Q00053—HHS ACF 'Administration for Children and Families' Grant Management" under which Plaintiff would supposedly be hired on.

75. Plaintiff was excited: 1) Defendants were legitimate; 2) he had googled them, visited their website, and read about them before the interview; there seemed to be no email spoof, and he applied formally online; and lastly, 3) the job offer was an excellent.

*Ho- Chunk Inc. requires a drug test, credit, and background checks*

76. To fast-track the hiring process, Ludwig urged Plaintiff that he needed to quickly undergo a drug test, a credit and criminal background checks. *See* Exhibit 8.

77. The same day, Plaintiff received the clinic site information, visited the location, filled out the forms, and gave his urine and hair samples for drug testing.

78. The results were forwarded to Defendants who kept quiet, and said nothing. Plaintiff found out, on his own from the lab company website, that he had passed the drug test, credit check, and background check. In any case, Plaintiff already possessed a DHS Security Clearance that attested to his suitability specifically to work on DHS contracts.

*Plaintiff announces his resignation*

79. Plaintiff notified his employer of his acceptance of a new position and submitted his resignation to be effective as of January 2025. The knowledge transfer began.

*Ludwig announces the job offer rescission*

80. On October 29, 2024, two weeks later, Ludwig called Plaintiff and followed up in email, stating: "We have just been informed the contract has been awarded to another party." And

added this: "We genuinely appreciate your interest in joining Flatwater and the time you invested in the process. Your skills and experiences are impressive, and while we were unable to win this contract; I will certainly have you at the top of the list for future opportunities." No further explanation as to why they did not win the contract. *See* Exhibit 9.

81. Plaintiff was confused and shocked. After composing himself, he emailed Ludwig, seeking clarification about the contract recipient.

82. Ludwig replied that he was not aware of who won the contract.[5] *See* Exhibit 10.

83. Ludwig explained that he couldn't access the link that Plaintiff included in email so that he, Ludwig, could verify whether a specific contractor was the party awarded the contract.[6]

84. Ludwig explained that the IT administrator blocked the link. But there were other options if Ludwig were interested in viewing the link: (1) He could navigate from his mobile phone, (2) He could forward it to his personal mail and then view it or (3) he could create a temporary, time-based destructive email address, forward the link to a device email and access it from there.

85. Plaintiff found it unusual that Defendants declined to identify the successful awardee, given his prior experience applying for positions with Government contractors.

---

5. Ludwig was, at minimum, willfully ignorant. The contracting officer legally avails information about the contract winner to all participating bidders for the purpose of opposition, if necessary. Ludwig communicated as if he avoided learning the truth. He implied that the information existed (or did not), but he personally wasn't either informed, or whatever the case may be. He should have known if he exercised due diligence before communicating with Plaintiff.

6. Federal contracting practice ensures transparency, upholds professional standards, and allows candidates to pursue opportunities with the successful awardee if applicable. Federal Acquisition Regulation (FAR) – Fair Treatment Principle: While the FAR does not explicitly mandate that unsuccessful bidders notify applicants, it requires that contractors conduct procurements with "fairness" and "openness" (48 C.F.R. § 1.102-2(c)(3)). A failure to communicate key outcomes/information—such as contract award decisions—could be construed as inconsistent with these principles. Government Accountability Office (GAO) Bid Protest Standards: GAO rulings emphasize that contractors must avoid misleading or arbitrary actions in procurement-related hiring. *Matter of DynCorp International LLC*, B-414785.3, 2018 CPD ¶ 67). A sudden lack of communication of relevant information after a bid loss, without reasonable justification, could support claims of arbitrary treatment.

86. Plaintiff has experience applying for positions with Government contractors, being accepted and rejected, which are binary outcomes in an application process. A well-established industry norm, reinforced by federal procurement guidelines, dictates that contractors who fail to secure a Government contract should, at minimum, inform job applicants and affiliates of the bid's outcome, including the identity of the winning contractor. *See* Exhibit 11.

*Plaintiff resigns from his employer*

87. Plaintiff eventually resigned from his employment in January 2025.

88. His new unemployment status triggered financial stress and strife, partly resulting in divorce proceedings; he relocated from Fairfax, VA to Richmond, VA and downgraded his lifestyle from a three-bedroom apartment to a one-bedroom apartment. Plaintiff now lives in a one-bedroom apartment.

89. Based on his prior experience and the nature of Defendants' hiring process, Plaintiff reasonably believed that no legitimate employer would require a candidate to undergo drug testing, credit, and criminal background checks after extending a contingent offer of employment unless it intended, in good faith, to employ the candidate upon satisfaction of the stated contingency.

90. Plaintiff's belief was grounded in commonsense, professional hiring norms, past experience with recruiters in general and probably some unknown law.

91. Plaintiff had some experience with fraudulent recruitment schemes. Defendants were Government contractors with a seemingly good reputation. While modern fraudsters also advertise through legitimate platforms such as Indeed.com, they do not go so far as to request a drug test, a credit check, and background screenings—that is cybercrime. *See* Exhibit 12.

92. Further, Plaintiff vets employers to weed out criminal associations. Reputable platforms, such as Indeed.com, also vet their own platforms, too. *See* Exhibit 13.

93. Defendants' hiring process was new in Plaintiff's experience.

*Plaintiff Performs Due Diligence*

94. A deep, unsettling instinct within him stirred, signaling that something was amiss.

95. After resolving divorce-related issues and going through therapy, Plaintiff decided to research and understand what had happened, or at least find out about the contract recipient.

96. In July 2025, Plaintiff obtained a g2xchange.com premium account and started researching contractors, bids, awards, oppositions…learning the terminology…etc.

97. Plaintiff visited other platforms including GovTribe.com, FPDS.gov, SAM.gov, USASpending.gov and tried numerous online services that track government contract awards.

*Plaintiff's Shock Discovery*

98. It was through the course of research that a new narrative gradually came into focus.

99. It turns out that before September 12, 2024—seven days after Plaintiff had applied for the Data Analyst II position—there was an announcement that HSSI had secured and signed a contract with the Department of Homeland Security (DHS), U.S. Secret Service Division, to provide Data Analytics services under NAICS 541612. *See* Exhibit 14.

100. NAICS 541612–Computer Systems Design Services–matched Plaintiff's skills.

101. The material terms of the DHS contract aligned precisely with Mireles's description:

- ✓ It provided Data Analytics support services.
- ✓ It carried an estimated value exceeding $6.2 million.
- ✓ It spanned a five-year performance period (and was renewable).
- ✓ It was awarded to HSSI as the sole bidder.
- ✓ Mireles did confirm that the contract award was imminently expected (or not past December 2024)—when it was even already awarded.

102. Plaintiff needed time to methodically reconstruct events to be able to recognize that Defendants may have deliberately misled him by misrepresenting material facts. If Defendants concealed material facts, they affected Plaintiff's decision as to his former employment and deprived him of another employment opportunity.

*Due Diligence*

103. Plaintiff searched in Google, found and downloaded the 105-page Request for Quotation (RFQ) document related to Solicitation 75ACF124Q00053.

104. Solicitation 75ACF124Q00053 was published by the HHS ACF on August 5, 2024; and was issued to GSA eBuy under Multiple Award Schedule (MAS), under NAICS 541611. The solicitation appeared to be an umbrella under which multiple contracts would be awarded.[7]

105. Plaintiff immediately requested bidder information from HHS via email.

106. Plaintiff has already contacted the HHS Contracting Officer Kevin Esber. Now, it is up to Defendants to tell the truth about that contract, and tell this Court when the said contract was awarded to another contractor.

107. The work under the solicitation was categorized as NAICS 541611 and deals with finance and management consulting which have nothing to do with Plaintiff's profile.

---

7. NAICS 541611–Administrative Management and General Management Consulting Services–provides contract support to assist with grants management services, including training and technical assistance to ACF's grant recipients." The skills and experience required must include Management and Financial Consulting, Acquisition and Grants Management Support, and Business Program and Project Management Services Provide operating advice and assistance on administrative and management issues. Examples include: strategic and organizational planning, business process improvement, acquisition and grants management support, facilitation, surveys, assessment and improvement of financial management systems, financial reporting and analysis, due diligence in validating an agency's portfolio of assets and related support services. None of the required skills under MAS 541611 corresponded to Plaintiff's skills or experience.

108. Plaintiff conducted an independent research and discovered that approximately 2,926 contractors were pre-approved under 541611. FGI was listed with the other pre-approved contractors, whereas HSSI and HCI were not.[8]

109. After several weeks of research, the number of contractors had decreased to approximately 1,587, with FGI still listed—prompting Plaintiff to take a closer interest in the significance of FGI's appearance under NAICS 541611.

110. Ludwig's email assertion that the contract under 75ACF124Q00053 had been awarded to another party could not be accurate given the extensive contractor list under NAICS 541611; if it were true, Plaintiff needed to understand the context and what was actually happening.

111. Having published Solicitation 75ACF124Q00053 on August 05, 2024, HHS ACF awarded other contracts right after this date. For instance, Guardians of Honor LLC was awarded an $8M Contract on August 07, 2024 related to a different solicitation 75ACF124F59002.

https://app.g2xchange.com/health/posts/hhs-acf-awards-8m-customer-service-improvement-project-support-services-task




112. Between September 2024 and October 15, 2024, HHS ACF awarded several notable medium-to-large contracts to various contractors. These awards were published on multiple

8. HCI operates through its subsidiaries. Importantly, neither HCI nor HSSI appeared under MAS 541611 with the other pre-approved contractors. This raises an obvious question. Why then did HCI post the Data Analyst II position that Plaintiff applied to on Indeed.com? The answer is that HCI advertised the job position on behalf of HSSI which was awarded the DHS U.S. Secret Service Data Analytics Contract under NAICS 541612.

government contract tracking sites, including g2xchange.com, as shown below. However, none of these awards pertained to Solicitation 75ACF124Q0005. Some examples are:

https://app.g2xchange.com/search_v2?posts%5Bquery%5D=ACF



Award • ~1 min read Sep 26, 2024

**MEF Associates awarded HHS ACF Temporary Assistance for Needy Families (TANF) ...**

Health **HHS**

Like Bookmark



Award • ~1 min read Sep 30, 2024

**Guidehouse lands HHS ACF Data Capacity Staffing Services contract**

Health **HHS**

Like Bookmark



Award • ~1 min read Sep 30, 2024

**Cherokee United Services scores HHS ACF Translation and Small-Scale Event Logistic ...**

Health **HHS**

Like Bookmark



Award • ~1 min read Sep 30, 2024

**Cherokee United earns HHS ACF AWS Legacy General Support System (GSS) Migration ...**

Health **HHS**

Like Bookmark



Award • ~1 min read Oct 1, 2024

**Mathematica nabs HHS ACF Research, Evaluation, and Technical Assistance contract**

Health HHS

Like Bookmark



Award • ~1 min read Oct 2, 2024

**A1M Solutions nabs HHS ACF ASA OI Enterprise Services (PMO-ES) contract**

Health HHS

Like Bookmark



Award • ~1 min read Oct 8, 2024

**Peers and Partners lands HHS ACF OHSEPR Support Services contract**

Health HHS

Like Bookmark



Award • ~1 min read Oct 15, 2024

**MSG earns HHS ACF Logistical and Administrative Support contract**

Health HHS

Like Bookmark

113. Of the HHS contracts awarded, there were no HHS ACF Grants Management Support Services and Technical Assistance Contract awarded under Solicitation 75ACF124Q00053 on or around October 29, 2024 as asserted by Ludwig.

114. As of the filing date of this Complaint, Plaintiff has been unable to identify any contract awarded under RFQ 75ACF124Q00053 on or around October 29, 2024.

115. Even assuming arguendo that Defendants might contend that some 'unknown' contract was awarded under 75ACF124Q00053 on or around October 29, 2024, Plaintiff never applied to work for FGI or on that contract; Plaintiff applied to work for HCI, which had already been awarded the DHS U.S. Secret Service Data Analytics Contract by September 12, 2024.[9]

116. Ipso facto, the statements made by FGI in the job offer letter and by Ludwig in his email and throughout the interview process constituted affirmative misrepresentations.

117. Moreover, Plaintiff was unable to identify any HHS ACF contract of significance awarded between October 16, 2024, and November 13, 2024—a period that coincided with the start of Fiscal Year 2025.

*More Due Diligence*

---

9. 75ACF124**Q**00053:

- **75** → Department of Health & Human Services (HHS)
- **ACF** → Administration for Children and Families
- **124** → Fiscal Year 2024 (Oct 1, 2023 – Sept 30, 2024)
- **Q** → Request for Quotation (RFQ) (a solicitation type under FAR Part 13)
- **00053** → The 53rd procurement instrument number that office issued in FY 2024

Agencies issue RFQs through GSA MAS because they're faster, compliant, lower-risk, and cost-effective, while still giving them competitive pricing and access to pre-vetted vendors. Usually, multiple contracts of different sizes are issued to different vendors through the vehicle for a single solicitation. Using tools like GSA eBuy, agencies can post RFQs and quickly receive multiple quotes from contractors, accelerating procurement timelines. Because the solicitation is 75ACF124**Q**00053, any contract awarded would necessarily be formatted as 75ACF124**C**XXXXX (XXXXX represents the contract sequence number).

Firstly, whether a RFQ posted on August 5, 2024 would result in a contract being awarded by October 29, 2024—less than three months after the solicitation publication date is speculative. Secondly, Solicitation 75ACF124Q00053 could have been issued retroactively, for a contract already awarded, for instance, a recompete and for compliance purposes only. Lastly, Plaintiff could not identify *a contract, any contract* awarded on, around or by October 29, 2024 related to 75ACF124**Q**00053.

118. On November 14, 2024, Koniag Data Solutions, LLC, announced that it had been awarded a 5-year, $8.3M contract by HHS ACF to develop a Repatriation Case Management System. The awarded contract was related to solicitation 75ACF124Q00064; the Contract ID was 75ACF124C00021; UEI: N19BZQQSEUV4 and NAICS: 541511.

https://app.g2xchange.com/health/posts/koniag-lands-hhs-acf-repatriation-case-management-system-contract




119. On November 19, 2024, RIVA Solutions, Inc. announced that it, too, had been awarded two new task orders under the $76M single-award FMP BPA with the HHS PSC. As part of this work, RIVA will develop centralized financial reporting capabilities for the Administration for Children and Families (ACF) Child Care and Development Fund (CCDF) program.

https://app.g2xchange.com/health/posts/riva-solutions-wins-two-task-orders-with-hhs-psc-to-enhance-financial-reporting-and-grants-management




120. Ludwig asserted that they lost the contract to provide 'management support for ACF Grants' to another party—a contract that appears to have been awarded, in whole or in part, to Riva Solutions, Inc., in November 2024. However, MAS 541611, under which RFQ 75ACF124Q00053

was issued, is unrelated to the contract awarded to Riva Solutions. In other words, neither Koniag Data Solutions nor Riva Solutions participated in MAS 541611.

121. HHS ACF grants are awarded to multiple recipients all fiscal year long. https://www.acf.hhs.gov/ana/current-recipients. Each HHS ACF grantee addresses different needs.

122. HHS ACF then extends multiple contracts to multiple contractors—under one solicitation—to provide technical assistance and management support to HHS ACF grantees.

123. There are no generic HHS ACF grants [as conveyed in the contingent job offer], but there are only HHS ACF **XXXX** grants (where **XXXX** is a specific sequence number).

124. By the end of the fiscal year 2024, there were only three HHS ACF grants awarded to Nebraska-based entities excluding the Winnebago Tribe.

125. The most recent instance in which the Winnebago Tribe of Nebraska received an ACF grant was in Fiscal Year 2006—nearly twenty years before the close of Fiscal Year 2024. That award was minimal in size. Moreover, there is no evidence suggesting that the Tribe would have secured another ACF contract after nearly two decades without such funding.

https://www.acf.hhs.gov/sites/default/files/documents/ana/nebraska_1.pdf

**WINNEBAGO TRIBE OF NEBRASKA**



**Project Title:** Winnebago Leadership Capacity Project

**Award Amount:** $100,000

**Type of Grant:** Social and Economic Development Strategies

**Project Period:** 9/30/2005 – 9/29/2006

**Grantee Type:** Tribe

126. In August 2024, FGI secured a sole-source contract award for a year-long task order worth $4.5M from the DOI Bureau of Indian Affairs. https://app.g2xchange.com/fedciv/posts/flatwater-wins-doi-bia-demd-support-services-task



Award • ~1 min read Aug 22, 2024

**Flatwater wins DOI BIA DEMD Support Services task**

FedCiv DOI

Search term(s) found in post

Like Bookmark

127. In September 2024, HSSI secured the sole-source, 5-year, $6.2 million DHS U.S. Secret Service Contract, for which Plaintiff alleges that HCI advertised the position on Indeed.com. https://app.g2xchange.com/fedciv/posts/ho-chunk-shared-services-company-earns-dhs-usss-data-analytics-support-services-task.



Award • ~1 min read Sep 12, 2024

**Ho-Chunk Shared Services Company earns DHS USSS Data Analytics Support Services task**

FedCiv DHS

Like Bookmark

128. Defendants asserted that they were awaiting a HHS contract award under Solicitation 75ACF124Q00053, which they claimed had been granted to another party. However, Defendants' success appeared limited to sole-source contracts set aside for Indian economic enterprises, making it highly unlikely for them to secure a contract amid some 2,900 competitors.

129. HHS had terminated some of its contracts with FGI in 2024 (75H70724P00091) Flatwater Professional Services Company T4C (Full/Partial)/De-Scope Modification/Non-Renewal. https://www.hhs.gov/sites/default/files/hhs-terminated-contracts.pdf

130. The likelihood that FGI would have secured a new, multi-year HHS ACF contract under Solicitation 75ACF124Q00053 was highly improbable.

131. Furthermore, when an agency issues an instrument, such as a Request for Quotation (RFQ 75ACF124Q00053), through a vehicle like a GSA Multiple Award Schedule (MAS), several outcomes are possible:[10]

a. Any contractor, including defendant FGI, who meets the eligibility requirements (i.e., is pre-approved) will appear on the MAS bid page listing all eligible contractors.

b. Any pre-approved contractor, like FGI, may claim to have bid for the project even if they did not actually submit a proposal.

c. Any pre-approved contractor, such as FGI, can submit a quote even knowing they have little to no chance of being considered, let alone awarded the contract.

d. Anyone, including Plaintiff, can access the RFQ document online and potentially assert that they also submitted a bid. (Plaintiff retains the 105-page document related to RFQ 75ACF124Q00053).

e. Recompete contracts are difficult to win due to the challenges of reassigning a contract to a different contractor, including potential job losses; this makes it unlikely for a new contractor to succeed or for the incumbent to lose the contract.

---

10. Defendants assumed the risks of their actions because compliance left them no alternative. They required Plaintiff's personal data to meet contractual obligations and facilitate billing. Before performing any work for the Government—particularly for national security-related contracts such as the U.S. Secret Service—résumés must be reviewed and approved. Without presenting a highly qualified professional who met the job description requirements, Defendants would not have been permitted to bill. Plaintiff exceeded these requirements, and, unfortunately, his racial status, being Black, made him an easy target for deception.

Typically, contractors present a qualified candidate to an agency at a higher rate (e.g., $115,000 as offered to Plaintiff) while paying the candidate a lower amount (e.g., $80,000), retaining the difference as profit. While controversial, this practice is generally legal. Employees in Government contractor companies often update their résumés for consideration on various contracts, and if the contractor is awarded the work, they may bill across multiple contracts or support both their primary and a new contract temporarily. These practices reflect standard, legitimate contracting operations.

In this case, however, Defendants' greed led them to commit fraud. Rather than engage in permissible contracting practices, they misappropriated Plaintiff's identity and personal data to secure payments for themselves, denying Plaintiff the opportunity for lawful employment and unjustly enriching themselves at his expense. This constitutes a classic "ghost contractor" scheme.

**Additional Facts**

132. Plaintiff turned to Artificial Intelligence (AI) platforms—including Gemini, Copilot, ChatGPT, and Perplexity—for research assistance, but none identified a contract related to the solicitation.

133. Plaintiff alleges that Solicitation 75ACF124Q00053 was published as a retroactive recompete under FAR 8.405-2(c)(2) for compliance purposes. Upon discovery, Plaintiff will demonstrate that some contracts under Solicitation 75ACF124Q00053 had already been issued months prior to Defendants' claim that only one contract was supposedly issued in October 2024.

134. Furthermore, there was no legal basis for Defendants to assume, assert, or convey that a contract award was imminent, in violation of FAR requirements. *See* Exhibit 17.

135. Both FGI and HCI maintained active contracts with other federal agencies (e.g., DoD, DOI), where they could have engaged Plaintiff, yet they did not.

136. In December 2024, FGI was awarded an additional contract but never contacted Plaintiff. This contract had a ceiling value of $3,963,283.20 and a period of performance extending through April 12, 2030.

https://app.g2xchange.com/fedciv/posts/flatwater-secures-sec-managed-print-services-mps-contract




137. Around March 2025, Ho-Chunk Technical Solutions, Inc. was awarded another Government Contract, yet they never contacted Plaintiff as previously promised.

**Ho-Chunk gets federal contract to aid hearing loss center**. Ho-Chunk Technical Solutions, a subsidiary of Nebraska-based Ho-Chunk Inc.'s All Native Group, is one of six companies awarded a $98 million contract providing services to the Department of Defense Hearing Center of Excellence. 3/05/2025

138. Contractors typically renew or extend their contracts at the end of the fiscal year. In August and September 2025, Defendants began the renewal and extension process for previously awarded Government Contracts, yet they never contacted Plaintiff as promised.

139. Upon discovery, it will be shown that Defendants posted similar data-related jobs in 2024 and 2025, yet they never contacted Plaintiff as promised.

140. Further discovery will reveal that Plaintiff applied to more than 80 jobs in 2025 but has been unable to secure employment. *See* Exhibit 15.

The Contingent Job Offer – *See* Exhibit 7.

---

141. In retrospect, Defendants' contingent job offer stood out from prior Government contractor contingent offers. *See* Exhibit 16.

142. Plaintiff alleges that the offer letter appeared to be a recycled template.

143. Upon review, Plaintiff uncovered several red flags. Having vetted Defendants, the red flags corroborate Plaintiff's allegations that Defendants perpetrated a fraud against him:

*A. Short Acceptance Window*

Requiring acceptance "within 24 hours" was highly unusual for a professional role on a Federal Government contract and may have been a sign that Defendants were pushing urgency to shortcut due diligence. From the initial contact by Ludwig on September 27, 2024, to his job offer on October 15, 2024, only 10 business days had elapsed—a rushed and suspicious timeline.

*B. No Direct Contact with a Hiring Manager or HR representative*

The offer is signed generically by the "Flatwater Hiring Team" rather than a specific person. Legitimate offers include the name, title, and phone of a hiring manager or HR representative. Mireles never shared his contact number. Ludwig's phone always redirects to voicemail. Also, the offer letter has the logo of Flatwater Group, but the address is of Ho-Chunk, Inc in Nebraska.

*C. No Start Date In The Job Offer Letter*

This was a huge red flag. The start date is "dependent upon completion of all the contingencies." With no concrete timeline, this signaled there was no actual position until and unless the contract was awarded, increasing risk that the offer will evaporate without warning.

*D. Overemphasis on Collecting Personal Data*

The contingencies (I-9, eVerify, background check, drug test) require submission of sensitive information. If the contract is not awarded, the company would have no legal basis to have collected data or subsequently retain the data—raising the prospect of fraudulent intent.

*E. Unprofessionalism and Generic Contract Details*

Defendants included confidential procurement data in a job offer, allegedly real-looking but misappropriated numbers (75ACF124Q00053); and a broad umbrella under which the contract would happen, namely, HHS Administration for Children and Families Grant Management.

*F. Rushed Onboarding Process*

Asking for sensitive Personal Identifiable Information (PII) too soon…if a company asks for PII before any real verification process, that is a strong indicator of fraud.

*G. "At-Will" Employment Language with Minimal Commitment*

Repeating that the employer could terminate "at any time for any reason" before the job even started, combined with other contingencies made the commitment one-sided.

*H. Contract Award Contingency*

The offer was contingent upon the "successful award of the contract," meaning employment and compensation were not guaranteed unless a Government Contract was awarded to the employer. Fraud schemes use this tactic to lure and pressure candidates into sharing Personal Identifiable Information without any real prospect of employment.

*I. Unusually High Pay for the Role*

Ludwig, not Plaintiff, proposed the annual salary of $115,000 for the "Data Analyst II" role. Plaintiff has historically worked for below-market salaries. As a Black African immigrant in the United States, he has never countered a job offer and often feels compelled to downplay his qualifications, accepting whatever offer is presented to secure employment. Typically, Plaintiff submits ten job applications to obtain a single job interview. Given the current economic downturn and Executive Order 14173, this situation is even more challenging. Unlike individuals of other races who may have the luxury to negotiate salaries, Plaintiff views negotiation as counterproductive. Accordingly, he accepted Ludwig's offer without question, but the offer was consistent with market rates and his prior employment at DHS. *See* Exhibit 16.

*J. Ludwig, recruiter at HCI, seemed to be the mastermind*

HCI advertised the job position. Plaintiff applied to HCI. Yet Ludwig, an HCI recruiter, extended a contingent offer with FGI and then rescinded it, and later made representations Plaintiff alleges were false. Discovery will reveal why an HCI recruiter made an employment offer for FGI.

*K. Takeaway. Patterns Suggestive of Fraud*

- Lack of Clear Contract Status: Legitimate Government contractors will usually wait for a contract award before making firm offers.

- o Aggressive Data Solicitation: Offers that push for completion of background checks, eVerify, and collection of personal information while still contingent can expose candidates.
- o Pressure Tactics and Insufficient Transparency: short acceptance window, vague employment details, opaque communication about what will happen if conditions are not met…

*L. Government Contracting Context*

- o By FAR rules, Government contractors are subject to specific rules and may not make binding offers before an award. *See* Exhibit 17. Fraudulent schemes often leverage "pending contract" language without backing by real contract eligibility.
- o The combination of urgent acceptance requirements, substantial data collection prior to legitimacy, and lack of clarity on what contract or work is actually available, marked the letter as a potentially fraudulent.

144. A FAR-abiding business would have advertised the position, awaited the contract award, and only then commenced the hiring process. *See* Exhibit 18 (Illustrative Example).

Plaintiff's career suffered significantly over the last 15 years because of race.

---

145. In 1997, Plaintiff fled the Democratic Republic of Congo, following three civil wars, including the Rwandan Genocide.

146. After relocating to South Africa, Plaintiff faced systemic exclusion and struggled to gain admission in universities; he was denied citizenship twice over 13 years and issued a "must-leave" order when seeking a refugee status in the alternative—as immigrants are now experiencing in America. He was granted asylum status after judicial intervention overruled the Government.

147. Plaintiff is no stranger to racial discrimination.

148. Despite homelessness, Plaintiff was determined to pursue a future through education. In one particularly memorable instance in 2002, as a student in Mining Engineering at

the University of Pretoria, Plaintiff endured overt segregation—Black students seated on one side of the aisle and white students on the other, hurling demeaning slurs for daring to accept admission in a "white" institution—Plaintiff's engineering dreams never materialized.

149. The circumstances of this suit brought up bitter memories from past experiences with racism because the contact was initiated and closed by a white person.

150. Plaintiff earned two Bachelor of Science Degrees (2000–2006): (1) BSc. with triple majors in Chemistry, Physics, Applied Mathematics (Univ. of South Africa, 2004), and BSc. Honors Degree in Applied Geophysics (Univ. of Witwatersrand (Wits), 2006).

151. Plaintiff was awarded a prestigious NSF scholarship to study Geophysics in the U.S. He earned a Master's Degree in Applied Geophysics (Penn State Univ/Wits Univ, 2011).

152. A federal judge, reviewing Plaintiff's background of documented persecution and statelessness, converted the 13-year South African asylum status into U.S. refugee status.

153. Plaintiff then earned a Master of Public Policy in 2013. (Univ. of Mass Dartmouth).

154. Plaintiff developed skills, and thus, enrolled in the Federal Government's AmeriCorps VISTA program to serve, and was paid 125$ per month for one year.

155. Over the past 15 years, Plaintiff had to work low-paid jobs or remain unemployed: He canvassed door-to-door in New York City; worked in the oilfields of Texas; and drove for Uber in Pennsylvania. Plaintiff worked so long as the work provided a lawful paycheck.

156. Plaintiff possesses over 20 years of experience in technical fields including major programming languages (Python, C, C++...) and a decade of specialized experience in Data Analytics and Teleseismics Inversion Data Modeling.

157. In 2021, a Government contractor hired Plaintiff and thus, his Security Clearance was issued to work for DHS. He has used the same to work on NSF & FAA contracts.

158. Over the last 15 years, only DHS paid him, as a contractor, nearly half his worth at US$105,000.00 annually. *See* Exhibit 16. That is why Plaintiff wished to work for Defendants.

159. Defendants found Plaintiff highly qualified and experienced; however, instead of recognizing his merit with a proper offer, they chose to exploit it for their own benefit.[11]

160. Plaintiff did not endure years of sacrifice, working hard, upskilling, and tolerating discrimination only to be re-discriminated against in the worst way possible for the economic and financial benefits of the Winnebago Tribe of Nebraska.

161. After Plaintiff's profile was submitted to multiple agencies, federal agents called in to inquire. Plaintiff discovered that a single call from a prospective employer—after his job application—was legally sufficient to gather his data for submission to the agencies for federal compliance purposes. In other words, Plaintiff suffers from systemic discrimination.

162. Plaintiff then understood why some prospective employers only called once. Plaintiff has a list of employers, he believes, may have engaged in similar discriminatory conduct.

163. Repeated submissions of Plaintiff's profile triggered some red flags, resulting in Plaintiff's information being placed in some federal databases, and being monitored.

164. Plaintiff now faces a catch–22 job hunting trap, whether to continue applying for jobs, and enable bad actors like Defendants to exploit him or stop applying altogether.

---

11. Plaintiff frequently encounters job postings requiring security clearances. Here, Plaintiff possessed the requisite DHS clearance to perform the work. During Plaintiff's initial phone call with Ludwig, Plaintiff introduced himself, described his experience, and disclosed his security clearance. Ludwig acknowledged that the clearance was a great advantage. Plaintiff contends this is precisely the point of a clearance—much like Defendants' certification as a small, disadvantaged business provides them with pre-vetted and special contractor status for government contracts; Plaintiff, as a member of a protected class holding a security clearance, was likewise pre-vetted with a special status. However, not only was he denied employment by the very person who recognized the advantage, but Defendants even used the clearance and minority status to further ingratiate themselves with the government while abusing the very same government that granted both Plaintiff and Defendants the special statuses.

165. Plaintiff had planned to add new experience to his portfolio and be in a position to one day also compete for Government Contracts on behalf of his entrepreneurial ventures.

166. Plaintiff's ventures, aside from the formal full-time jobs, suffered from Defendants' misrepresentations and job offer rescission.

167. Plaintiff trusted and relied on Defendants' misrepresentations, resulting in significant personal and financial consequences, including: 1) Quitting his job; 2) failure to earn the promised pay, 3) Reducing his job search effort in reliance on their promise; 3) Suffering near marital collapse; 4) Relocating from Fairfax, VA, to Richmond, VA—a city with relatively fewer economic opportunities; 5) Downgrading his living situation from a three-bedroom to a one-bedroom apartment; 6) From February 2025 to August 2025, depleting his approximately $25,000 emergency fund on rent and other living expenses; 7) Being unable to secure new employment; and 8) Reputational damage from federal investigation, and 9) loss of federal career trajectories.

168. Between July 2025 and September 2025, Plaintiff spent ~160 hours of research on online government contracting sites (USASpending.gov, FPDS.gov, SAM.gov, GovTribe.com and OrangeSlices.ai). His monthly subscription plan on g2exchange.com costs 100$. Plaintiff researched to understand Government procurement, the solicitation process and Defendants' operations including contracts, awards, terminations, and the likes.

169. Plaintiff sought to retain counsel from multiple law firms but was unable due to financial constraints, and a lack of specific legal expertise.

170. Hence, Plaintiff spent ~315 hours of legal research up to writing his pleadings. A legal research services company is offering pro brono advice separately.

171. Plaintiff is irreparably damaged. In light of Defendants' alleged misconduct and the resulting injuries sustained by Plaintiff, full accountability is both necessary and warranted.

## 9. CLAIMS FOR RELIEF

### Federal Law Claims

### COUNT I
### Violation of the Equal Protection Clause in the Enforcement of Contracts—42 U.S.C. § 1981

172. Plaintiff repeats and realleges the allegations set forth, under each count, in each of the preceding and subsequent paragraphs as if fully set forth herein.

### Legal Standard

173. Section 1981 protects "the equal right of '[a]ll persons within the jurisdiction of the United States' to 'make and enforce contracts' without respect to race." *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (quoting 42 U.S.C. § 1981(a)). A plaintiff must prove that race was the *but-for* causation. *See Comcast Corp. v. National Assoc of African American-Owned Media*, 589 U.S. ___ (2020).

174. To state a § 1981 claim, a plaintiff must identify rights "under the existing (or proposed) contract that he wishes to make and enforce." *Id.* at 479–80. "Courts use the three-step *McDonnell Douglas* framework for establishing racial discrimination under Title VII." *See Carney v. Am. Univ.*, 151 F.3d 1090, 1092–93 (D.C. Cir. 1998). Under that framework, a plaintiff without direct evidence of discrimination related to contractual rights must first plead a prima facie case by establishing "that 1) he is a member of a protected class, 2) he suffered an adverse employment action, and 3) the unfavorable action gives rise to an inference of discrimination. *See Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002).

175. A plaintiff can raise an inference of discrimination beyond the classic demonstration of being treated less favorably than similarly situated colleagues outside their protected class. *See George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005). Courts recognize that an inference of discriminatory intent can be supported by other types of circumstantial evidence including

(1) biased or stereotypical treatment by decision-makers, (*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)), and (2) unexplained departures from standard company procedures. *See Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir. 1997).

**Factual Allegations**

176. Plaintiff, a Black male of African descent, is a member of a protected class.

177. Defendants are private actors who (1) direct operations of the tribal entities; (2) participated in Plaintiff's hiring process; and (3) orchestrated the job offer and its rescission.

178. Ludwig and Mireles found Plaintiff qualified for the Data Analyst II role, and extended a job offer contingent on a government contract award.

179. Plaintiff considered the job offer and signed it at annual salary of US$115,000.00.

180. Ludwig, on behalf of HCI, rescinded the job offer because FGI purportedly failed to secure a government contract. Plaintiff later found that either there was no such contract awarded during the period asserted by Ludwig or there was no such contract at all in the first place.

181. Plaintiff alleges that the contingent offer rescission was not due to failure to secure a government contract—but for being Black.

182. The job offer rescission caused Plaintiff multiple harms as explained herein.

*Plaintiff's rights*

183. The signed job offer letter created a binding contract, of which Plaintiff has a right to make and enforce contracts. A prospective employee is protected from wrongful rescission for unlawful discriminatory reasons based on race, or other protected characteristics. Upon signing, Plaintiff gained additional rights stemming from contract law and federal statutes, e.g., the rights to the position and its specified terms, such as job title, salary, start date and general good faith. If an offer is contingent upon a background check, the Fair Credit Reporting Act (FCRA) grants the right

to be notified, provide authorization, and contest any inaccurate information before an adverse decision, such as a rescission, is finalized. There is also a right to expect that information provided during the hiring process will be utilized as lawfully intended.

*Race as But-For (because of) Cause*

184. Plaintiff applied to work for HCI; he was contacted and put through a hiring process by Ludwig—Senior Recruiter at HCI. Plaintiff alleges that HCI would not hire him because "HCI exists to create jobs for members of the Winnebago Tribe of Nebraska"—not applicants of Plaintiff's race—HCI publishes this fact in corporate materials and on their website. *See* Exhibit 2.

185. In the same vein, Ludwig presented Plaintiff with a contingent offer of employment with FGI, despite the fact that Plaintiff had never applied for employment with FGI.

*Inference of racial discrimination*

186. Plaintiff alleges that Defendants' rescission based on the failure to secure a Government contract was a pretext—Defendants already had secured the DHS U.S. Secret Service Data Analytics Contract for which they advertised the position on Indeed.com.

187. Plaintiff alleges that Defendants' request of a drug test, credit, and criminal background checks, despite Plaintiff's valid and active security clearance, suggested racially-motivated disqualification efforts—the job offer was rescinded after Defendants received the negative lab tests and background checks results, which favored Plaintiff.

188. Upon belief and information, Plaintiff alleges that Defendants could also claimed that the job position was canceled, but Defendants never used that pretext because the job position was effective, and Defendants were required to meet federal EEO compliance mandates for the role.

189. Upon further belief, Defendants' actions may have been motivated by Plaintiff's race. Plaintiff alleges that Defendants underestimated his analytical acumen due to his race,

undermining 20 years of professional experience including 10+ years as a Data Analyst, and assumed that Plaintiff won't uncover the truth because he was Black—classic evidence that the selection process and offer rescission were based on racial stereotyping.

190. As a direct and proximate result of Defendants' unlawful employment practices, Plaintiff's damages include 1) lost wages and benefits from the rescinded $115,000 annual salary; 2) lost career trajectory and higher clearance eligibility; 3) lost entrepreneurial opportunities to launch a government contracting company; 4) lost profits from his entrepreneurial venture valued over $12 million; and 5) reputational harm and continued barriers to advancement.

191. Section 1981 authorizes equitable and legal relief. Additionally, Plaintiff is entitled to consequential damages under 42 U.S.C. § 1988, and such other equitable or legal relief as the Court deems just and proper.

**Count II**
**Violation of the Civil Conspiracy Statute—Civil Conspiracy to Deprive of Equal Protection & Equal Contractual Rights—42 U.S.C. § 1985(3)**

**Legal Standard**

192. 42 U.S.C. § 1985(3) creates a cause of action for persons injured by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." *Griffin v. Breckenridge*, 403 U.S. 88 (1971) established that section 1985(3) covers conspiracies to interfere with federal rights, including cases of racial discrimination and violations of civil rights. "The conspiracy must be aimed at denying the plaintiff equal protection under the law" and that "the intent to discriminate must be clear." *See Thomas v. Salvation Army*, 84 F.3d 198 (4th Cir. 1996). Further, "to state a § 1985(3) claim, Plaintiffs must plausibly allege the following elements: 1) a conspiracy of two or more persons, 2) who are motivated by a specific class-based, invidiously

discriminatory animus to 3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, 4) and which results in injury to the plaintiff as, 5) a consequence of an overt act committed by the defendants in connection with the conspiracy. *See Sealed v. Patriot Front,* No. 3:22-cv-00670, 2026 U.S. Dist. LEXIS 41307, at *42 (E.D. Va. Feb. 27, 2026). (ECF No13).

193. "The essence of a civil conspiracy is an agreement, but the agreement need not be formal or express; a meeting of the minds may be inferred from the alleged [mis]conduct." *See Hinkle v. City of Clarksburg*, 81 F.3d 416, 421(4th Cir. 1998).

194. With respect to overt acts, "although a plaintiff must make specific allegations connecting the defendants to the injury, he need not plead an overt act against each defendant since a single act by one conspirator may sustain a conspiracy claim." *Alleco, Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 639 A.2d 173 (Md. Ct. S. App., 1994), *aff'd*, 665 A.2d 1038 (Md. 1995). Generally, "a conspiracy may be proved by circumstantial evidence, for in most cases it would be practically impossible to prove a conspiracy by means of direct evidence alone." *See Hoffman v. Stamper*, 867 A.2d 276, 291 (Md. 2005). Specifically, "a conspiracy may be established by inference from the nature of the acts complained of, the individual and collective interest of the alleged conspirators, the situation and relation of the parties at the time of the commission of the acts, the motives which produced them, and all the surrounding circumstances…" *Id.*

**Factual Allegations**

*1) A conspiracy of two or more persons (co-Conspirators)*

195. Defendants are, jointly, co-Conspirators. *See* Nature of the Claims, *ante* at 4.

*2) who are motivated by a specific class-based, invidiously discriminatory animus*

196. HCI was racially motivated in its selection of Plaintiff as a target for chicanery, intrusion, and deprivations. *See* Inference of Racial Discrimination, *ante* at 37.

*3) to deprive the plaintiff of the equal enjoyment of rights secured by the law to all*

197. The co-Conspirators devised a process to put Plaintiff through a sham hiring process, collect the sought data and thereafter, rescind the contingent offer of employment under a pretext.

*4) and committed overt acts in furtherance of conspiracy objectives*

198. In furtherance of the conspiracy, the co-Conspirators committed these overt acts:

a. HCI advertised the Data Analyst II role on Indeed.com after HSSI was awarded the DHS Contract, but omitted the contingency requirement from the job posting.

b. Ludwig and Mireles conducted the interviews, representing that any job offer would be contingent upon an imminent government contract award, while knowingly concealing that the relevant DHS contract had already been awarded to HSSI.

c. Ludwig used alternative contact details, i.e., different email address and phone number during the hiring process—he was unresponsive to emails and phone calls yet remained active on the LinkedIn Network as HCI Senior Recruiter, as of the initial filing of the complaint.

d. Ludwig, on behalf of HCI, extended a contingent job offer from FGI referencing the HHS Solicitation ID; and created an impression of a legitimate hiring process.

e. Ludwig and Mireles then created a sense of urgency, insisting that Plaintiff submit to a drug test, credit check, and criminal background check.

f. Plaintiff complied and Defendants obtained his results. HCI then rescinded the offer of employment, explaining that the HHS Contract had been awarded to another party.

g. Ludwig then promised that Plaintiff would be considered for future opportunities. However, he never reached out in 2 years after that promise after they won similar contracts.

*5) which results in injury to the plaintiff*

199. Defendants' actions led Plaintiff to resign from his previous job and landed him in a federal database, being investigated and scrutinized as a potential fraudster/scammer after his profile appeared in multiple contract submissions.

200. As a direct and proximate result of Defendants' deceitful conduct, Plaintiff suffered damages including: 1) anxiety and apprehension about seeking future employment due to the fear of being similarly deceived, commoditized, stigmatized, and exploited by prospective employers; 2) the loss of a career advancement opportunity; and 3) reputational harm arising from multiple submissions of his profile to multiple federal contracts.

201. A claim under 42 U.S.C. § 1985(3) may entitle a plaintiff to relief including compensatory damages for economic losses, emotional distress, and other injuries caused by the conspiracy; punitive damages against individual defendants are permitted and supported by evidence of malicious or reckless conduct; declaratory and injunctive relief to prevent future violations, and such other equitable or legal relief as the Court deems just and proper.

**COUNT III**
**Violation of the Fair Credit Reporting Act**
**15 U.S.C. §§ 1681 et seq.**

**Legal Standard**

202. The Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 et seq., regulates the procurement and use of consumer reports for employment purposes. Before obtaining a consumer report, an employer must provide the applicant with a clear and conspicuous standalone written disclosure and obtain the applicant's written authorization. 15 U.S.C. § 1681b(b)(2)(A).

203. Before taking any adverse employment action based in whole or in part on a consumer report, the employer must provide the applicant with a copy of the report and a written

summary of the applicant's rights under the FCRA. After taking adverse action, the employer must also provide the notices required by 15 U.S.C. § 1681b(b)(3).

204. A person who willfully or negligently fails to comply with the FCRA is liable for the remedies provided under 15 U.S.C. §§ 1681n and 1681o, including actual damages, statutory damages for willful violations, punitive damages where appropriate, costs, and reasonable attorney's fees. A willful violation includes conduct undertaken in knowing or reckless disregard of the FCRA's requirements. See *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 57–58 (2007).

**Factual Allegations**

205. Plaintiff is a "consumer" within the meaning of 15 U.S.C. § 1681a(c).

206. Defendants procured or caused the procurement of consumer reports for employment purposes and are subject to the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 *et seq.*

207. On October 15, 2024, HCI made the contingent job offer and Ludwig emailed Plaintiff that "the background check and drug screening had been initiated", instructing Plaintiff to complete the required screening process. Plaintiff thereafter submitted urine and hair samples for drug testing and later received notification that his credit file had been accessed for inquiry.

208. Before procuring Plaintiff's consumer reports, HCI was required by 15 U.S.C. § 1681b(b)(2)(A) to provide Plaintiff with a clear and conspicuous written disclosure, in a document consisting solely of that disclosure, and to obtain Plaintiff's written authorization.

209. HCI failed to provide Plaintiff with the standalone written disclosure required by the FCRA before procuring his consumer reports. Ludwig's email confirms that Defendants had already initiated the background screening process before informing Plaintiff that it had begun.

210. On October 29, 2024, HCI rescinded Plaintiff's contingent job offer. Before taking that adverse employment action, HCI did not provide Plaintiff with a copy of any consumer report or a written summary of his rights under the FCRA, as required by 15 U.S.C. § 1681b(b)(3)(A).

211. After rescinding the contingent offer, HCI likewise failed to provide the post-adverse action notice required by the FCRA, including notice identifying the consumer reporting agency, Plaintiff's right to obtain a free copy of the report, and his right to dispute its accuracy.

212. Plaintiff learned independently that he had successfully passed the drug screening and background investigation. Defendants never provided Plaintiff with copies of the reports or any of the notices required by the FCRA.

213. Defendants' violations were willful and/or negligent within the meaning of 15 U.S.C. §§ 1681n and 1681o. As federal contractors that routinely conduct pre-employment screening, Defendants knew or should have known of their obligations under the FCRA but failed to comply with its mandatory disclosure and notice requirements.

214. As a direct and proximate result of Defendants' violations, Plaintiff was deprived of the procedural rights guaranteed by the FCRA, including the opportunity to review and challenge the consumer reports before the offer recission. Plaintiff also suffered actual damages, including losses associated with the rescinded offer and consequential damages to be proven at trial.

215. Pursuant to 15 U.S.C. §§ 1681n and 1681o, Plaintiff is entitled to recover actual damages, statutory damages for willful violations, punitive damages as permitted by law, costs, attorney's fees if applicable, and such other relief as the Court deems just and proper.

## Count IV
## Violation of The Trafficking Victims Protection Act (TVPA)—18 U.S.C. § 1589-90

**Legal Standard**

216. The Trafficking Victims Protection Act ("TVPA"), codified at 18 U.S.C. §§ 1589–1590, prohibits forced labor and trafficking with respect to forced labor and involuntary servitude.

217. Under 18 U.S.C. § 1589, it is unlawful for any person or entity to knowingly benefit, financially or by receiving anything of value, from participation in a venture that has engaged in providing or obtaining the labor or services of a person by any of the prohibited means set forth in that section, while knowing or acting in reckless disregard of the fact that the venture has engaged in such conduct.

218. Under 18 U.S.C. § 1590, it is unlawful to knowingly recruit…, obtain, advertise, maintain,…or solicit a person for labor or services in violation of 18 U.S.C. § 1589.

219. The TVPA defines "serious harm" to include any physical or nonphysical harm, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or continue performing labor or services in order to avoid incurring that harm. See 18 U.S.C. § 1589(c)(2).

**Factual Allegations**

220. Ludwig and Mireles engaged in a scheme of labor trafficking by:

a. Luring Plaintiff into a sham hiring process in order to harvest his data (drug test, credit check, background checks…etc.).

b. Psychologically coercing Plaintiff by creating a false sense of urgency to undergo checks and screenings on the basis that he will be hired; thereby, also creating irreversible dependency to derive gains or benefits from his profile unlimitedly.

c. Exploiting Plaintiff's information for commercial gains to secure payments from the Federal Government/enhance eligibility status or otherwise monetize/benefit from his identity—improperly/without consent—is Aggravated Identity Theft (18 U.S.C. § 1028A).

221. Plaintiff alleges that Defendants' conduct may fall within the definition of a "severe form of trafficking in persons" under 22 U.S.C. § 7102(11)(B), by recruiting him for services through the alleged fraud and psychological coercion.

222. Plaintiff further alleges that Defendants' ongoing reliance on his unlawfully obtained personal data to meet compliance certification requirements and obtain financial or other benefits, including monetary compensation, contract awards, credits, or anything of value derived from the use of his profile—without his express consent—constitutes involuntary servitude in violation of the TVPA.

223. Further, stolen personal data can be used to commit other fraud such as opening unauthorized accounts, or selling on the dark web, leading to long-term damages.

224. Upon belief and information, Defendants exploit non-Indian applicants of different races from different states or all over the United States to enhance their standing with the Federal Government or to secure Government contracts.

225. As a direct and proximate result of Defendants' deceptive and unlawful labor practices, Plaintiff suffered 1) humiliation as in being reduced to a lab specimen and trafficked as a data point to the Federal Government; 2) irreparable loss of human dignity; and 3) uncertainty regarding the security and safety of the harvested data.

226. Courts recognize that fraudulent recruitment followed by compelled labor satisfies the TVPA. A claim under 18 U.S.C. §§ 1589–1590, through the civil remedy provided by 18 U.S.C. § 1595, may entitle a plaintiff to relief including compensatory damages for economic losses,

emotional distress, pain and suffering, and other injuries resulting from the trafficking violations; punitive damages where permitted and supported by evidence of willful, malicious, or reckless conduct; declaratory and injunctive relief to prevent ongoing or future violations; pre- and post-judgment interest; and such other relief as the Court deems just and proper.

**District of Columbia Law Claims**

**Count V**
**Unjust Enrichment**

**Legal Standard**

227. "Unjust" enrichment asks for more than abstract unfairness; it is based in established equitable principles. *See Falconi-Sachs v. LPF Senate Square, llc*, 142 A.3d 550, 556 (D.C. 2016). D.C. law makes clear that enrichment is unjust when obtained through fraudulent inducement or wrongful conduct. *See Vicki Bagley Realty, Inc. v. Laufer*, 482 A.2d 359, 368 (D.C. 1984).

228. Unjust enrichment is not based on whether there was a duty to bestow a benefit, but whether justice warrants recovery as if there had been a promise to pay. See *4934, Inc. v. District of Columbia Dep't of Emp't Servs.*, 605 A.2d 50, 55 (D.C. 1992).

229. Under D.C. law, the claim of "Unjust Enrichment" arises under the principles of equity rather than an express contract per se. *See United States ex rel. Modern Electric, Inc. v. Ideal Electronic Security Co.*, 81 F.3d 240, 251 (D.C. Cir. 1996) (emphasizing that unjust enrichment applies where no express contract exists).

**Factual Allegations**

230. Ludwig and Mireles urged Plaintiff to undergo criminal background screenings, a credit check, and a drug test under the guise of a bona fide job offer. In reality, they did not intend to employ Plaintiff. Defendants sought to harvest data to satisfy federal compliance requirements imposed by the awarded DHS Contract as prerequisite to the release of federal funds. By

misappropriating Plaintiff's data and documentation for federal reporting and compliance purposes—to be used in a manner that Plaintiff never authorized, to profit them and not Plaintiff—Defendants engaged in what Plaintiff calls "Fraudulent Inducement."

*Defendants had many other alternatives at their disposal*

231. Plaintiff applied to work for HCI, and HCI could have simply ignored plaintiff's application and picked another candidate. HCI could have interviewed Plaintiff, and then rejected his candidacy. HCI could have hired Plaintiff at a lower salary rate. HCI could have hired Plaintiff in their other active projects. Defendants could have simply said the job role had been cancelled. Alternatively, HCI could have waited for the contract award per FAR (Exhibit 17), and then extended the job offer and thereafter, required a drug test and background checks.

*Defendants had to get Plaintiff to provide his other data*

232. Upon information and belief, Plaintiff alleges that HCI found him to be a fit selection, based on his profile, to meet the requirements of EO 11246 (including Affirmative Action) for compliance purposes. In the alternative, HCI put him through a racial profiling process, requiring the tests and checks to find reasons to justify the job offer recission.

233. Plaintiff alleges that HCI obtained credibility, compliance credits, financial benefits, and other advantages by using Plaintiff's data for federal compliance purposes. This is the basis of Plaintiff's "unjust enrichment" claim.

234. Upon information and belief, Defendants are ongoingly using Plaintiff's data in federal procurement processes, enabling them, upon certifying compliance to the Government, to renew the awarded contract throughout the initial five-year contract term and beyond.

235. As a direct and proximate result of Defendants' misconduct, Defendants were unjustly enriched through monetary gains, profits, advantages, and other benefits derived from the

unauthorized use of Plaintiff's data. Plaintiff alleges that Defendants' retention of any gain, without legal justification, is inequitable; thus, Defendants must disgorge any and all derived gains.

236. A claim for unjust enrichment under D.C. law may entitle a plaintiff to equitable relief including restitution of the value of benefits unjustly retained by the defendant, disgorgement of ill-gotten gains where appropriate, pre-, and post-judgment interest, declaratory relief as warranted, and such other equitable or legal relief as the Court deems just and proper.

**Count VI**
**Fraudulent Concealment**

**Legal Standard**

237. A plaintiff asserting fraudulent concealment must plead that the defendant 1) had a duty to disclose a material fact to the plaintiff; 2) failed to disclose that fact; and 3) intended to defraud or deceive the plaintiff and the plaintiff 1) acted in justifiable reliance on the concealment; and 2) suffered damages as a result of the defendant's concealment. *See Lee v. Bos*, 874 F. Supp. 2d 3, 6 (D.D.C. 2012) and *Howard Univ. v. Watkins*, 857 F. Supp. 2d 67, 75 (D.D.C. 2012).

**Factual Allegations**

238. Defendants recruited Plaintiff for a Data Analyst II position and extended Plaintiff a written contingent offer of employment. Defendants possessed material information concerning the Government Contract upon which the employment allegedly depended, information that was exclusively within Defendants' knowledge and unavailable to Plaintiff.

*Duty to Disclose*

239. Defendants owed Plaintiff a duty to disclose material facts because:

a. Defendants solicited Plaintiff to make a significant business decision—whether to accept employment, disclose confidential personal and professional information, undergo

background investigations, and submit to drug testing—while possessing information unavailable to Plaintiff concerning the existence, status, and nature of the underlying Government Contract.

b. Having elected to speak regarding the employment opportunity and the alleged contractual contingency, Defendants were required to disclose sufficient additional facts to ensure that their statements were not misleading. A party who speaks on a material matter must disclose information necessary to prevent partial disclosures or half-truths from misleading another

*Material Concealment*

240. Defendants allegedly concealed material facts, including:

a. The public Indeed.com advertisement omitted any disclosure that employment was contingent upon the award of a Government Contract.

b. During the interview process, Defendants introduced the contingency for the first time but failed to disclose the details related to the contract (identity, status, the work itself…).

c. The contingent offer letter identified only the Solicitation No. 75ACF124Q00053 while omitting the contract number, award identifier, contract title, contracting vehicle, award documentation…etc. which would have enabled Plaintiff to verify Defendants' representations.

d. By selectively disclosing only the solicitation number while withholding material information concerning the alleged contract award, Defendants created a misleading half-truth regarding the existence and status of the contingency.

e. Ludwig subsequently represented that the offer was withdrawn because the Government Contract had been awarded to another party, while failing to disclose extra information supporting that representation.

241. Ludwig was unable to identify the successful awardee (or the contract) itself after Plaintiff asked.

242. Upon information and belief, Plaintiff alleges that Ludwig's professed lack of knowledge was false or, at a minimum, willfully blind. Under the Federal Acquisition Regulation, unsuccessful offerors generally are entitled, upon request, to receive post-award information identifying the successful offeror and other information necessary to evaluate the procurement and determine whether to pursue a bid protest. If Defendants had submitted an offer under the solicitation and lost, they could have obtained the identity of the successful awardee from the Contracting Officer. Conversely, if Defendants had not submitted an offer, then Defendants could not truthfully attribute the withdrawal of Plaintiff's offer to losing that procurement. Upon discovery, Defendants must identify whether they submitted a proposal under Solicitation No. 75ACF124Q00053 and, if so, identify the awardee they contend received the contract.

*Facts Supporting the Allegation of Concealment*

243. Plaintiff alleges, upon information and belief, that Defendants' representations concerning the alleged contract award were false. Plaintiff's investigation revealed:

a. As of October 29, 2024, no contract award had been made under Solicitation ID.

b. Plaintiff did not find the award in USASpending.gov and likewise, he did not find the award in other Federal Government web portals, e.g., FPDS.gov.

d. Plaintiff failed to identify any HHS Administration for Children and Families award matching the alleged procurement during the relevant period.

e. Plaintiff reached out to OrangeSlices.ai, a government contracting intelligence platform, and they never located the corresponding award.

f. Plaintiff contacted GovTribe.com regarding Solicitation No. 75ACF124Q00053, and GovTribe likewise could not identify any resulting contract award.

g. Plaintiff subsequently subscribed to OrangeSlices.ai and G2Xchange, to monitor HHS contract awards. As of the initial filing, Plaintiff never received notification of any contract award associated with the Solicitation ID.

h. Plaintiff continues to search for the awarded contract under Defendants' Solicitation No. 75ACF124Q00053.

*Concealed Facts*

244. Upon information and belief, Defendants concealed material facts, including:

a. Whether Defendants had actually submitted a bid under Solicitation No. 75ACF124Q00053.

b. Whether any contract was ever awarded under that solicitation.

c. Whether Defendants had already secured a different Government Contract for which they advertised on Indeed.com and Plaintiff was being recruited.

d. The identity and status of the contract allegedly forming the contingency contained in Plaintiff's offer letter.

*Intent*

245. Plaintiff alleges that Defendants concealed these material facts with the intent that Plaintiff would rely upon their incomplete disclosures by:

a. Continuing through the recruitment process.

b. Accepting the contingent offer of employment.

c. Providing extensive confidential personal information.

d. Completing drug testing and background investigations.

e. Foregoing other employment opportunities while awaiting Defendants' decision.

*Reliance*

246. Plaintiff reasonably relied upon Defendants' omissions and partial disclosures:

a. The concealed information concerned Defendants' internal procurement activities and was exclusively within Defendants' knowledge.

b. The concealed information also concerned the already awarded DHS contract.

c. Plaintiff reasonably relied on Defendants, as Government contractors, to accurately represent the status of the underlying procurement.

d. Plaintiff had no practical means of verifying Defendants' representations during the hiring process because Defendants withheld the identifying information necessary to do so.

e. Plaintiff accepted the contingent offer, completed the requested onboarding requirements, and refrained from challenging Defendants' representations until he later investigated the procurement process.

247. As a direct and proximate result of Defendants' alleged fraudulent concealment, Plaintiff suffered damages, including loss of time spent during the hiring process, about 12 months of conducting research, premium subscriptions, and consequential damages to be proven at trial.

248. Because Plaintiff alleges that he was induced into the contingent employment agreement through fraudulent concealment of material facts, Plaintiff seeks all remedies available under D. C. law, including rescission, restitution, compensatory damages, and such further relief as the Court deems just and proper.

## Count VII
## Fraud in Contract (or Fraudulent Misrepresentation)

### Legal Standard

249. A contract is a promise or set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty; its essential elements are mutual assent (offer and acceptance), consideration, and enforceability. *See United*

*States v. DynCorp Int'l LLC*, 10 F.4th 17, 24 (D.C. Cir. 2021) (A valid contract requires a 'meeting of the minds' through an offer, acceptance, and consideration, with terms sufficiently definite…).

250. Under D.C. law, "[t]he essential elements of common law fraud are: 1) a false representation 2) in reference to material fact, 3) made with knowledge of its falsity, 4) with the intent to deceive, and (5) action is taken in reliance upon the representation." See *Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1074 n.22 (D.C. 2008).

**Factual Allegations**

251. Defendants' contingent job offer was a binding contract.

252. The contingent job offer—premised on pre-award information including calculations, predictions, and probability of the contract award—was in direct violation of the Federal Acquisition Regulations (FAR). *See* Exhibit 17.

253. Defendants included only a solicitation ID in the contingent job offer letter rather than specific details that would have helped identify the contract/project Plaintiff would work on.

254. Furthermore, the solicitation ID represented a broad procurement umbrella under which many contracts would be awarded across different vehicles – not just one contract as asserted by LudwigPlaintiff alleges that the contingent job offer was materially deficient because it was vague, omitted important details or contained half-truths.

255. Plaintiff reasonably and justifiably relied on Defendants' representations in the job offer because they had exclusive access/knowledge of their own procurement processes and data.

256. Relying on the contingent job offer letter, without knowledge of the concealed facts and lacking access to information to confirm the truth, Plaintiff resigned from his prior job and forewent other employment opportunities in anticipation of starting work with Defendants.

257. As a direct and proximate result of Defendants' omissions or misrepresentations, Plaintiff sustained job loss, financial losses, loss of income, and career disruption, and seeks compensatory and punitive damages in an amount to be determined at trial.

258. A claim for Fraud in Contract under District of Columbia law may entitle a plaintiff to relief including compensatory damages for economic losses and other injuries caused by the fraud; punitive damages where supported by evidence of willful, malicious, or fraudulent conduct; rescission or other appropriate equitable relief where warranted; pre- and post-judgment interest; and such other legal or equitable relief as the Court deems just and proper.

## Count VIII
## Promissory Fraud

### Legal Standard

259. To state a claim for promissory fraud, a plaintiff must plead facts that, if true, establish the defendant made a promise with a present intent not to perform it at the time the promise was made. Specifically, the plaintiff must allege "1) a false representation, 2) in reference to a material fact, 3) made with knowledge of its falsity, 4) with the intent to deceive, and 5) action is taken in reliance upon the representation." *See Virginia Acad. of Clinical Psychologists v. Group Hospitalization & Med. Servs., Inc.*, 878 A.2d 1226, 1233 (D.C. 2005).

260. Critically, the plaintiff must plead the defendant's present intent not to perform with the particularity required by Federal Rule of Civil Procedure 9. *See Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) and *Naeem v. Bornhoff*, 977 A.2d 1031, 1043 (D.C. 2009).

### Factual Allegations

261. During the recruitment process, Ludwig, acting on behalf of HCI, represented to Plaintiff that HCI would contact him regarding future employment opportunities if suitable positions became available. Plaintiff relied upon that representation.

262. Plaintiff alleges that, at the time the representation was made, Defendants had no present intention of performing that promise.

263. Plaintiff's allegation is based upon the following facts, which together support an inference of his alleged fraudulent intent:

a. Defendants exist primarily to create employment opportunities for members of the Winnebago Tribe of Nebraska, making it unlikely that they intended to recruit Plaintiff for future employment despite representing otherwise.

b. Defendants omitted the material contingency affecting the position from the job advertisement, but introduced it only during the interview process and the job offer letter.

c. Defendants advertised positions in Virginia but allegedly had no genuine intention of filling those positions with qualified Virginia applicants, instead using the recruitment process to satisfy Government contracting and compliance requirements.

d. Defendants failed to disclose that the underlying Government Contract, for which they advertised the job position, had already been awarded before advertising the position.

e. Defendants extended Plaintiff a job offer that Plaintiff alleges Defendants never intended to enforce as it contained misrepresentations as alleged.

f. Defendants determined that Plaintiff was qualified and, despite maintaining other active Government Contracts, and never contacted him regarding any such opportunities.

g. During the interview process, Defendants encouraged Plaintiff to continue seeking employment elsewhere, despite simultaneously representing that they would contact him regarding future opportunities. After the interview process, Defendants won additional Government Contracts and publicly advertised substantially similar positions during late 2024 and throughout 2025 but they never contacted Plaintiff as promised.

264. Plaintiff alleges that Defendants' subsequent conduct confirms that the promise was made without any present intent to perform. In August 2025, Plaintiff contacted Ludwig regarding employment opportunities but received no response. Ludwig's telephone directed callers to voicemail, and Plaintiff's emails went unanswered.

265. Upon information and belief, Ludwig remained at HCI as a Senior Recruiter during that period, as reflected on his LinkedIn profile.

266. Plaintiff further alleges that Defendants obtained Plaintiff's application materials and personal information by inducing him to participate in a hiring process that Defendants allegedly never intended to complete in good faith.

267. Upon information and belief, Defendants thereafter used Plaintiff's information to support certifications of compliance with Government contracting and equal employment obligations while lacking a present intention to perform those obligations truthfully. Such conduct may constitute promissory fraud and fraud in the inducement.

268. Plaintiff's reliance on Defendants' promise was reasonable and foreseeable. Defendants had multiple active Government Contracts, represented that they would contact Plaintiff regarding future opportunities, subsequently obtained additional Government Contracts, and later advertised similar positions. This led Plaintiff to reasonably believe that Defendants intended to honor their promise.

269. As a direct and proximate result of Defendants' failure to keep their promise, Plaintiff suffered damages including economic harm from foregone opportunities.

270. Because Plaintiff tailored his job search down in the hope that he will be considered for future positions by Defendants and suffered damages, he seeks all remedies available under D.C law and such further relief as the Court deems just and proper

## Count IX
## Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing

### Breach of Contract

### Legal Standard

271. A party alleging a breach of contract must prove that there was: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract (3) a material breach of that duty and (4) damages caused by the breach. *See Moini v. LeBlanc*, 456 F. Supp 3d 34, 50 (D.D.C. 2020) and *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (2009).

272. Under D. C. law, Plaintiffs are not required to allege the damages caused by a breach of contract to survive a Rule 12(b)(6) motion to dismiss. *See Francis v. Rehman*, 110 A.3d 615, 620 (D.C. 2015). Contract claims can proceed along unjust enrichment claims. See *In re Cap. One Consumer Data Sec. Breach Litig.*, 2021 WL 9734404, at *2 (allowing unjust enrichment to proceed alongside contract claim where parties disputed whether the privacy notice at the heart of the action was contractually enforceable, and whether it was part of Plaintiffs' express contract) quoted in *McNichols v. Capital One Bank, N.A.*, No. 1:26-cv-00145 (E.D. Va. Feb. 4, 2026).

### Factual Allegations

273. On or about October 15, 2024, Ludwig, acting within the scope of his authority on behalf of HCI and FGI, extended Plaintiff a contingent offer of employment for the position of Data Analyst II at an annual salary of $115,000.00. Plaintiff was satisfied and accepted the offer, and stood ready, willing, and able to satisfy, all conditions required of him.

274. Plaintiff alleges that the contingent offer constituted an enforceable contract under D. C. law because the parties intended to be bound subject to the stated contingency.

275. The contingent employment agreement imposed upon Defendants a contractual obligation to deal fairly with Plaintiff in administering the stated contingency. Defendants were obligated to truthfully communicate whether the contingency had occurred or failed.

276. Ludwig subsequently informed Plaintiff by telephone and email that the contingent offer was being withdrawn because Defendants had not secured the Government.

277. Plaintiff later discovered that the stated reason for rescinding the offer was allegedly false: No such Government Contract had been awarded to another entity as represented by Ludwig. Therefore, Defendants breached the employment agreement by rescinding the offer based upon a knowingly false or pretextual justification rather than the occurrence of the contractual contingency.

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

**Legal Standard**

278. In addition to the written provision of a contract, certain terms and conditions are implied as a matter of law; all contracts contain an implied covenant of good faith and fair dealing. (citation omitted). The implied covenant prevents either party from violating norms of decency, fairness, and reasonableness. *See Molock v. Whole Foods Market, Inc.*, 297 F. Supp. 3d 114, 132-33 (D.D.C. 2018) and *Wright v. Howard Univ.*, 60 A.3d 749, 754 (D.C. 2013).

**Factual Allegations**

279. Defendants breached the implied covenant of good faith and fair dealing inherent in the contingent employment agreement by exercising the contractual contingency dishonestly and in bad faith, including by:

a. Omitting the material contingency from the public job advertisement while disclosing it only after Plaintiff had invested himself in the hiring process.

b. Failing to identify the specific contract upon which the contingency depended, thereby preventing Plaintiff from verifying whether the stated contingency had actually failed.

c. Including only a broad Solicitation ID rather than sufficient contract information, making it impracticable for Plaintiff to ascertain Defendants' representations concerning the contingency.

d. Requiring Plaintiff to complete pre-employment requirements, including a drug screening and background investigation, despite allegedly lacking a good-faith intention to employ Plaintiff if the stated contingency occurred.

e. Representing that the contingent offer was withdrawn because the contract was awarded to another party while allegedly concealing material facts about the awarded contract.

f. Depriving Plaintiff of the benefit of the contingent employment agreement by invoking the contractual contingency in bad faith rather than for its intended contractual purpose.

280. As a direct and proximate result of Defendants' breach, Plaintiff suffered damages, including lost employment opportunities, lost compensation and benefits associated with the position, and other consequential damages to be proven at trial.

281. A claim for breach of contract and breach of the implied covenant of good faith and fair dealing under D.C. law may entitle a plaintiff to relief including compensatory damages for economic losses and other damages proximately caused by the breach; declaratory and injunctive relief where appropriate; specific performance or other equitable relief where warranted; pre- and post-judgment interest; and such other legal or equitable relief as the Court deems just and proper.

**Virginia State Law Claims**

**Count X**
**Intrusion Upon Seclusion**

**Legal Standard**

282. The compelled production of bodily fluids can constitute an unreasonable search and seizure within the meaning of the Fourth Amendment. *See Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 616–17 (1989) (urine testing is a search). The D.C. Circuit recognizes that unauthorized medical testing inflicts dignitary harm—even absent economic loss. *See Attias v. CareFirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017) (holding that data breach victims need not show additional harm beyond exposure of private data).

283. Privacy invasion can be enough to establish injury in fact—even without economic damages. *Id.* This principle is further reinforced where a statutory right to privacy is violated, as the invasion of a legally protected interest is itself a concrete injury. *See Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 514 (D.C. Cir. 2016) (a retailer's violation of the District's Facsimile Solicitation Act, which protects privacy interests, constituted a concrete injury-in-fact).

**Factual Allegations**

284. Defendants, through Ludwig and Mireles, required Plaintiff to submit to a pre-employment drug test and related medical screening as a condition of beginning employment.

285. Plaintiff agreed to undergo the testing only because Defendants represented that the procedures were lawful and necessary prerequisites to the anticipated employment.

286. During the testing process, laboratory personnel conducted their standard yet highly intrusive collection procedures, including:

a. Shaving Plaintiff's underarm hair for laboratory sampling;

b. Monitoring Plaintiff as he entered the restroom to provide a urine specimen; and

c. Directing Plaintiff to return the urine specimen without flushing the toilet. Such procedures constitute a substantial invasion of personal privacy.

287. Plaintiff submitted to these invasive procedures because he reasonably believed Defendants were acting in furtherance of a bona fide employment relationship and that his personal information would be collected and used solely for that purpose.

288. In reality, Defendants allegedly concealed material facts concerning the purported employment opportunity, including that the referenced DHS contract had already been awarded or otherwise could not support the contingent employment they represented. Despite warning Plaintiff that they might not receive the contract, Defendants simultaneously represented that an award was imminent, thereby inducing Plaintiff to continue participating in the hiring process and to surrender his confidential personal information.

289. Plaintiff alleges that the medical examinations and drug testing were therefore not legitimate employment necessities but a pretextual means of obtaining Plaintiff's private medical and personal information.

290. Ludwig and Mirles knew or should have known that Plaintiff's security clearance, which already satisfied the contract's requirements, eliminated any bona fide need for additional invasive screening. Because Plaintiff's consent was procured through material misrepresentations and fraudulent concealment, his consent to Defendants' intrusion was legally void.

291. Plaintiff alleges that Defendants obtained access to his bodily samples, medical information, and other confidential personal data for purposes to which Plaintiff never knowingly or voluntarily agreed.

292. Once obtained improperly, Plaintiff's sensitive personal information could be retained, analyzed, reused, disclosed, or incorporated into compliance, research, commercial, or other databases without Plaintiff's informed authorization. Such information possesses significant

commercial and operational value, and its unauthorized acquisition exposed Plaintiff to substantial privacy and consent violations.

293. Defendants' intentional intrusion into Plaintiff's private affairs would be highly offensive to a reasonable person because it involved compelled collection of biological samples and confidential medical information through deception rather than through informed and voluntary consent.

294. Defendants' conduct exposed Plaintiff's confidential information to the risk of retention, reuse, disclosure, or other unauthorized use beyond the limited purpose for which Plaintiff consented to its collection.

295. Ludwig and Mireles orchestrated the procurement of Plaintiff's data improperly. Any apparent consent Plaintiff gave to the collection of his biological samples and medical information was vitiated by Defendants' misrepresentations and fraudulent concealment. The unauthorized acquisition of confidential personal information itself constitutes a concrete invasion of Plaintiff's legally protected privacy interests.

296. As a direct and proximate result of Defendants' intentional intrusion upon Plaintiff's seclusion, Plaintiff suffered emotional distress, anxiety, fear, humiliation, loss of peace of mind, and dignitary injuries, all of which are compensable under District of Columbia law.

297. Plaintiff further suffered the loss of his right to control access to his most intimate medical and biological information, a privacy injury recognized independently of any subsequent disclosure or economic loss.

**Count XI**
**Tortious Interference With Business Expectancy**

**Legal Standard**

298. To plead tortious interference with business expectancy, a plaintiff must show 1) a valid business expectancy with a probability of future economic benefit, 2) defendant's knowledge of the expectancy, 3) intentional interference through improper methods, and 4) damages. *See Dunlap v. Cottman Transmission Sys., LLC,* 287 Va. 207 (2014).

299. Improper methods include fraud, deception, and misuse of confidential information. *Id.* The Fourth Circuit applies the same standard. *Id.*

**Factual Allegations**

300. Plaintiff had a reasonable business expectancy in:

- Starting his new employment with Defendants,
- Federal contracting work (due to his possession of a security clearance),
- New job opportunities consistent with his expertise,

301. Ludwig and Mireles knew of these expectancies and knowingly interfered by:

- Misrepresenting the status of the DHS and HHS contracts,
- Presented a contingent job offer on a contract that did not exist or they falsely claimed had been awarded to a different party,
- Retracting the offer based on a knowingly false explanation,
- Exploiting Plaintiff's qualified security-cleared status for Defendants' own Government contracting purposes.
- Making false promises as to future consideration for other opportunities.

302. Defendants' conduct—fraud, deceit, concealment, and misuse of Plaintiff's personal information—constitutes "improper methods" under Virginia law.

303. As direct and proximate result of Defendants' conduct, Plaintiff suffered immediate and long-term economic loss, inability to secure future employment, reputational harm in federal systems, emotional distress, and other related damages.

304. Plaintiff requests compensatory, punitive, and consequential damages, and such other legal or equitable relief as the Court deems just and proper.

**Count XII**
**Tortious Interference With Contract (or Existing Employment Contract)**

**Legal Standard**

305. A plaintiff must show 1) the existence of a valid contract, 2) the defendant's knowledge of the contract, 3) intentional interference causing breach or termination, and 4) resulting damages. *See Chaves v. Johnson*, 230 Va. 112, 120 (1985). Malice may be inferred where the defendant acts with improper motives or means. *Id.*

**Factual Allegations**

306. At all relevant times, Plaintiff was employed in a valid and ongoing contractual relationship. Defendants knew Plaintiff was so employed.

307. Ludwig and Mireles interfered with this contract by:

- Misrepresenting the existence and nature of a pending Government Contract,
- Presenting a knowingly false contingency arrangement,
- Demanding completion of drug tests, background checks, and onboarding steps to create the appearance of imminent employment.

308. Defendants' misrepresentations induced Plaintiff to resign from his former job.

309. The interference was improper because it was conducted through deceit, concealment of the already-awarded DHS contract, and exploitation of Plaintiff's reliance.

310. As direct and proximate result of Defendants' conduct, Plaintiff suffered loss of income, employment stability, financial security, relocation, emotional distress, and substantial consequential damages.

311. Plaintiff is entitled to compensatory, punitive, and consequential damages, and such other legal or equitable relief as the Court deems just and proper.

**Count XIII**
**Statutory Business Conspiracy (Or in the alternative, Common-Law Conspiracy)**

**Legal Standard**

312. Under Virginia law, a plaintiff states a claim for common-law conspiracy by alleging 1) an agreement between two or more persons, 2) to accomplish an unlawful purpose or a lawful purpose by unlawful means, and 3) resulting damages. *See Commercial Bus. Sys., Inc. v. Halifax Corp.*, 253 Va. 292, 300 (1997).

**Factual Allegations**

313. Same as stated under Count II.

**Count XIV**
**Violation of the Virginia Consumer Protection Act**
**(VCPA) (§ 59.1-196 et seq.)**

**Legal Standard**

314. Virginia state law protects consumers from fraudulent, deceptive, or misleading trade practices in consumer transactions. The VCPA, codified at Va. Code Ann. §§ 59.1-196 et seq., prohibits a wide array of deceptive practices. The VCPA makes it illegal to: a) "Misrepresent that goods or services have certain quantities, quantities, characteristics, or benefits." (§ 59.1-200(5; b) "Use any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction" (§ 59.1-200(14), and c) "Make a misrepresentation that the consumer transaction involves or does not involve rights, remedies, or obligations." (§ 59.1-200(16)).

**Factual Allegations**

315. Plaintiff is a "consumer" within the meaning of the Virginia Consumer Protection Act ("VCPA"), Va. Code § 59.1-196 *et seq.*, because Defendants solicited Plaintiff through commercial advertising and induced him to enter a consumer transaction involving employment-related screening services and the disclosure of valuable Personally Identifiable Information (PII).

316. Defendant Ho-Chunk, Inc. ("HCI"), headquartered in Nebraska, maintains an office in Fairfax, Va and conducted the recruitment giving rise to this action through that Va office.

317. HCI advertised a Data Analyst II position on Indeed.com to applicants in Virginia. The advertisement represented the position as an available employment opportunity but did not disclose that the position was contingent upon the future award of a Government contract.

318. In or about September 2024, Plaintiff received the advertisement through Indeed.com's job-alert service, which identified employment opportunities in the Fairfax, Virginia area. After reviewing the job description, Plaintiff applied for the position.

319. Ludwig, acting as HCI's recruiter, contacted Plaintiff regarding the position and arranged interviews, including a second interview with Mireles of FGI. During the recruitment process, Ludwig and Mireles represented that Plaintiff would be hired if the stated contingency were satisfied and thereby, encouraged Plaintiff to proceed with the hiring process.

320. In reasonable reliance on Defendants' representations, Plaintiff accepted the contingent offer, executed the onboarding documents, authorized background and credit investigations, submitted to drug testing, and disclosed confidential information

321. On or about October 29, 2024, Ludwig informed Plaintiff that the contingent offer of employment was being rescinded because Defendants had not been awarded the Government contract and that the contract had instead been awarded to another contractor.

322. Plaintiff subsequently investigated Defendants' assertion and alleges that it was false, and that either no contract arising from Solicitation No. 75ACF124Q00053 had been awarded on or about October 29, 2024, contrary to Ludwig's representation or even existed at all.

323. Defendants offered employment based upon representations about a procurement that they knew, or should have known, were materially incomplete or misleading.

324. Plaintiff further alleges that Defendants engaged in deceptive practices by:

a. Advertising the position without disclosing that it depended upon the uncertain future award of a government contract;

b. Including allegedly misleading information, partial disclosures, or omissions in the contingent offer of employment;

c. Inducing Plaintiff to complete extensive pre-employment requirements through omissions and misleading representations about the availability of the position;

d. And representing that the offer was rescinded because the contract had been awarded to another party when Plaintiff contends that representation was false.

325. Plaintiff reasonably relied upon Defendants' advertisements, omissions, and representations in deciding to pursue the position, accept the contingent offer, submit to extensive pre-employment screening, and forego other employment opportunities.

326. Plaintiff alleges that Defendants' deceptive acts and omissions occurred in connection with a consumer transaction and constitute unlawful practices prohibited by the VCPA.

327. When an employer engages in such activities as a job posting for consumers—job applicants—to consider and submit applications; they are entertaining "consumer transactions" within the meaning of the VCPA, and the employer's conduct falls within the scope of consumer protection laws designed to prohibit deceptive trade practices. Remedies under the VCPA include

actual damages, statutory damages where applicable, treble damages for willful violations, reasonable attorney's fees, costs, and such other relief authorized by Va. Code § 59.1-204.

**9. Prayer for Relief**

WHEREFORE, for the foregoing reasons and others that may appear to this Court, Plaintiff respectfully prays for judgment against Defendants, jointly, as follows:

**I. Damages**

The damages requested below constitute Plaintiff's present good-faith estimate based upon information currently available. Plaintiff anticipates presenting documentary evidence, expert testimony, economic analysis, and other proof at trial establishing the calculation of compensatory and punitive damages.

a) Awarding compensatory damages in an amount presently estimated to exceed US$12,200,000.00, subject to proof at trial and amendment as discovery and experts warrant.

b) Awarding punitive damages in an amount to be determined by the trier of fact, but not less than US$12,200,000.00, or such greater amount as the evidence at trial may justify:

- Per remedies permitted under 42 U.S.C. § 1988.
- Lost wages, benefits, and consequential damages.
- Unjust enrichment from past, current, and future actions related to the unauthorized use of Plaintiff's data during and beyond the initial 5-year DHS contract term (at issue) and/or other federal procurement processes/contracts.
- Reputational harm and loss of federal career trajectories.
- Deception, intrusion, severe emotional distress, and near marital collapse.
- Humiliation, dehumanization, and commodification under the TVPA.

## II. Declaratory Relief

a) Declare that Defendants obtained Plaintiff's data fraudulently, for the purpose of securing government contracts, and their continued possession of his data is unlawful.

b) Order that Defendants issue a letter of apology to Plaintiff for the deception, intrusion, and emotional distress caused, and the commodification under the TVPA.

c) Order that Defendants:

- Expunge Plaintiff's data from all agencies where they submitted his data.
- Permanently destroy Plaintiff's data in their possession/custody/control.
- Engage an independent, court-appointed auditor (paid for by Defendants) to verify the destruction of Plaintiff's data in their position.

d) Compel Defendants' compliance with the lawful duties of their enterprises and bar their further contortion of Government contracting processes and all applicable Government contractor reporting, recordkeeping, and nondiscrimination requirements enforced by the Office of Federal Contract Compliance Programs (OFCCP).

## III. Injunctive Relief

a) Waive bond requirements for Plaintiff; and preliminarily enjoin the disbursement of Federal funds to Defendants under the DHS U.S. Secret Service Contract (RFP ID: 70US0924R70092138; Award ID: 70US0924F2GSA2058; Reference IDV ID: 47QTCB22D0368) due to the alleged ongoing fraud against the United States, pending an evidentiary hearing.

b) After evidentiary hearing, and if applicable, permanently enjoin the disbursement of Federal funds to Defendants related to DHS U.S. Secret Service Contract (RFP ID: 70US0924R70092138; Award ID: 70US0924F2GSA2058; Reference IDV ID: 47QTCB22D0368).

## 10. Demand for Jury Trial

Furthermore, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial on the claims set forth herein to the extent authorized by law.

Respectfully Submitted,

/s/ Isaac Mulamba

Isaac Mulamba
2465 J-17 Centreville Rd
No. 225, Herndon, VA 20171
Email: isaac.mulamba@gmail.com
*Assisted by:*

Orion Legal & Paralegal Services
probono@orionlegalservices.com
(804) 461 3214

Date: July 30, 2026

**Certificate of Service**

WE HEREBY CERTIFY that on this July 30, 2026, a copy of the Amended Complaint was filed with the Clerk and will be served upon the Defendants at the following physical address (upon order of the Court):

Ho-Chunk, Inc.,
Flatwater Group, Inc.,
Ho-Chunk Shared Services, Inc.,
Lance Morgan,
Rocky Mireles,
Jay Ludwig

818 St Augustine Dr,
Winnebago, NE 68071

Respectfully Submitted,

ISAAC MULAMBA

*/s/*

Isaac Mulamba
2465 J-17 Centreville Rd
No. 225, Herndon, VA 20171
Email: isaac.mulamba@gmail.com

*Assisted by:*

Orion Legal & Paralegal Services
probono@orionlegalservices.com

Date: July 30, 2026